# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF FLORIDA

Case No. 10-20864-CR-SCOLA/TORRES

UNITED STATES OF AMERICA,

      Plaintiff,

vs.

FLORIDA WEST INTERNATIONAL AIRWAYS, INC.,
RODRIGO HIDALGO, et al.,

      Defendants.

_____/

## REPORT AND RECOMMENDATION[1]

This matter is before the Court on Defendants' Motions to Dismiss Indictment and Request for Evidentiary Hearing (the "Motions") [D.E. 67, 94]. This Court has thoroughly reviewed the Motions, responses, replies, the Parties' supplemental filings, the exhibits filed with the Court and is otherwise appraised of the entire record in this case. The Court also held a lengthy two-day evidentiary hearing on August 22 and 23, 2011, at which the Parties presented arguments on the pending Motions. For the following reasons, Defendant Rodrigo Hidalgo's Motion should be **GRANTED** and Defendant Florida West International Airways, Inc.'s Motion should be **DENIED**.

In light of our findings discussed herein and ultimate recommendation, the related motions [D.E 109, 139, 143, 144, 158, 170, 175] are also **DENIED**.

---

[1]Pursuant to 28 U.S.C. § 636 and the Magistrate Judge Rules of the United States District Court for the Southern District of Florida, these motions were referred to the undersigned Magistrate Judge for disposition. [D.E. 79, 97, 100, 115, 145, 186].

## I.  BACKGROUND

These Motions present a familiar third-party breach of contract issue arising in a relatively novel plea agreement context.  At bottom, Rodrigo Hidalgo ("Hidalgo") and Florida West International Airways, Inc. ("Florida West") (collectively the "Defendants") move to dismiss the pending indictment arguing that, by seeking this indictment, the Government has breached a 2009 plea agreement that immunized them.

Several years ago, the Government investigated a large price-fixing conspiracy affecting the air cargo industry.  As a result of that investigation, the Government indicted, among other air cargo providers, LAN Cargo, S.A. ("LAN Cargo") for participating in this alleged price-fixing conspiracy.  On January 21, 2009, the Government and LAN Cargo executed a plea agreement whereby LAN Cargo plead guilty to violating the Sherman Antitrust Act, 15 U.S.C. § 1, and paid a fine in exchange for immunity to certain employees and related corporations.  [D.E. 67-1, hereafter ("Plea Agreement")].  These immunity provisions state:

> Paragraph 14: Upon acceptance of the guilty plea called for by this Plea Agreement and the imposition of the recommended sentence, and subject to the cooperation requirements of paragraph 12 of this Plea Agreement, the United States agrees that it will not bring further criminal charges against [LAN Cargo] or any of [its] subsidiaries for any act or offense committed before the date of this Plea Agreement that was undertaken in furtherance of an antitrust conspiracy involving the sale of air cargo services. ... *[LAN Cargo] understand[s] that this Plea Agreement does not limit the ability of the Unites States to prosecute any company in which LAN Cargo had an ownership interest that ended prior to the date of this Agreement*, for any involvement such company may have had in an antitrust conspiracy involving the sale of air transportation services or for any other offense.

2

> Paragraph 15(a): Upon the Court's acceptance of the guilty plea ... *the Unites States will not bring criminal charges against any current or former director, officer, or employee of [LAN Cargo] or [its] subsidiaries (or against any current or former employee of LAN Cargo's parent corporation [LAN], or any of [LAN's] subsidiaries, whose primary responsibilities related to the sale of air cargo services for [LAN Cargo]), for any act or offense committed before the date of the Plea Agreement and while that person was acting as a director, officer, or employee of [LAN Cargo] or [its] subsidiaries that was undertaken in furtherance of an antitrust conspiracy involving the sale of air cargo services..., except that the protections granted in this paragraph shall not apply to* Armando Valdivieso, Roberto Bianchi, Alvaro Carril, Claudio Silva, and Tomas Silva.

*Id.* at 14-15 (emphasis added).

As additional background, LAN Cargo's parent company is LAN Airlines, S.A. ("LAN"), a Chilean-based airline engaged in the business of air passenger travel. LAN Cargo, its wholly owned subsidiary, handles the air cargo division of LAN and provides cargo related services to South and North America through a network of companies. Because certain countries regulate whether a foreign owned company may operate an airline within its borders, LAN Cargo maintains a close relationship with companies domesticated in those countries to provide service to all of the Americas. This web of airlines includes Aerolinhas Brasileiras, S.A. ("ABSA"), a Brazilian company, MAS Air ("MAS Air"), a Mexican company, and Florida West, an United States company. As further discussed below, Hidalgo and Florida West present ample evidence that this web of companies is referred to informally as the "LAN Cargo Group" – a unit acting with a cohesive purpose – which is controlled by LAN Cargo.

On December 2, 2010, the Government indicted the Defendants and others with one count of participating in an antitrust conspiracy involving "international air

transportation services for cargo between Miami, Florida and Colombia and elsewhere." [D.E. 1].  The Indictment alleges that from January 2002 until February 14, 2006 Hidalgo participated in a conspiracy to suppress and eliminate competition by fixing and coordinating certain components of cargo rates, including peak season, security and fuel surcharges for international air cargo shipments in violation of the Sherman Antitrust Act, 15 U.S.C. § 1.  It is further alleged that Florida West joined and participated in this conspiracy from August 2002 until February 14, 2006. *Id.*

### A.     *The Parties' Positions*

Specifically, Hidalgo asserts that paragraph 15 of the Plea Agreement provides immunity to him under all three categories:

1)   "any current or former director, officer, or employee of [LAN Cargo]"
2)   "any current or former director, officer, or employee of [LAN Cargo's] subsidiaries" or
3)   "any current or former employee of [LAN], or any of [LAN's] subsidiaries, whose primary responsibilities related to the sale of air cargo services for [LAN Cargo]."[2] [D.E. 157 at 1].

Hidalgo contends that he is immunized under the first two categories of the Plea Agreement because during the indictment period he was <u>simultaneously</u> an executive of LAN Cargo and LAN Cargo's subsidiaries South Florida Air Cargo ("SFAC") and Florida West.[3]   Notably, as discussed further below, Hidalgo contends that his

---

[2] The Plea Agreement actually refers to "Defendants," which includes both LAN Cargo and ABSA.  However, for our purposes, only LAN Cargo is relevant.

[3] Hidalgo worked for SFAC from January 1, 2002 until June 30, 2002, then Florida West from July 1, 2002 until February 14, 2006.  The indictment period relating to Hidalgo is from January 2002 to February 14, 2006.  SFAC is discussed in more detail below. *See* II.C.ii.

employment status with LAN Cargo was kept confidential to the public to maintain the appearance of separation between LAN Cargo and Florida West. *See* n.11, *infra*. Alternatively, if Florida West is deemed a subsidiary of LAN (rather than LAN Cargo), then Hidalgo is still immunized by the third category because his primary responsibilities related to the sale of air cargo services for LAN Cargo.

Taking Hidalgo's dual employment argument in parts, he first contends very simply that, if the evidence demonstrates that he worked as a LAN Cargo executive, then he is immunized from prosecution. Next, Hidalgo asserts the equally straightforward premise that, as a Florida West executive (which he undisputedly was), he is immunized as a subsidiary of LAN Cargo. However, because the Plea Agreement leaves the term "subsidiary" undefined, whether Florida West is a "subsidiary" of LAN Cargo is a disputed issue. Hidalgo argues that Florida West is a "subsidiary" of LAN Cargo as a matter of law based on two purportedly dispositive facts: 1) LAN Cargo held a 25% minority interest in Florida West; <u>and</u>, 2) LAN Cargo exercised actual control over Florida West's affairs. As for his alternative argument, Hidalgo maintains that all of his responsibilities, not just his "primary responsibilities," were for the sale of air cargo services for LAN Cargo and, thus, he is covered under the third category.

Similarly, Florida West contends that paragraph 14 of the Plea Agreement affords it immunity as a "subsidiary" of LAN Cargo. [D.E. 94 at 2]. Alternatively, and in response to Hidalgo's purported dual employment position, Florida West asserts that Hidalgo's alleged conspiratorial actions cannot be imputed to it because as a LAN

5

Cargo executive his actions were not performed within the scope of his Florida West employment.  [D.E. 160 at 2].

The Government disputes that either Hidalgo or Florida West is immunized by the Plea Agreement.  With respect to Hidalgo, as a preliminary matter, the Government rejects the notion that, while ostensibly just a Florida West executive, he was also silently a LAN Cargo executive during the indictment period.  But, even assuming he was, the Government disputes that he was a LAN Cargo executive during this period.  Next, the Government rejects Hidalgo's "subsidiary" interpretation and contends that, as a matter of law, a parent corporation must own a majority share of another company to create a parent-subsidiary relationship.  And because LAN Cargo (or LAN) owned only 25% of Florida West, it is not a subsidiary. Alternatively, assuming the Court concludes Florida West is a subsidiary of LAN, the undisputed facts demonstrate that Hidalgo's "primary responsibilities" were not for the sale of air cargo services for LAN Cargo.

As for Florida West, because the Government maintains that Florida West is not a subsidiary of LAN Cargo, it is excluded from paragraph 14 of the Plea Agreement. Moreover, the Government asserts that paragraph 14 actually carves Florida West (by description) out of that provision.  Finally, the Government rejects Florida West's "imputed conduct" argument because Hidalgo acted solely on behalf of Florida West during the indictment period. [D.E. 159 at 12-14].

On June 2, 2011, we held an initial hearing to determine whether an evidentiary hearing was necessary.  After entertaining the Parties' arguments, we granted the Defendants' motion for an evidentiary hearing.

### B.   *Findings of Fact Based on the Evidentiary Hearing*

During the two-day evidentiary hearing, the Parties presented nine witnesses and dozens of documents.  Including himself, Hidalgo called four witnesses (Michael Cuda, Jaime Silva, Steven Leonard and Alberto Faret) to testify about Hidalgo's relationship with Florida West and LAN Cargo, as well as LAN Cargo's relationship with Florida West.  Each witness previously worked for either LAN Cargo or SFAC/Florida West (with Hidalgo), and testified with personal knowledge regarding these corporations, Hidalgo's employment status and the interplay therein.  Relevant to these subjects, the Government called Joachim Haubold and Maria Martinez only. Haubold had worked for a consulting company providing services to LAN Cargo and Florida West.  Haubold testified with personal knowledge as to how the industry recognized the relationship between LAN Cargo and Florida West, his interactions with these companies, and the role that Hidalgo played in that relationship.  Martinez provided narrow testimony relating only to Hidalgo's LAN Cargo employment based on her personal knowledge as LAN Cargo's payroll administrator.

In addition to these witnesses, the Parties called the attorneys who principally drafted the Plea Agreement – Government attorney Mark Grunvig and LAN Cargo attorney James Dick.  These witnesses testified with personal knowledge as to the intent of the Government and LAN Cargo when they executed the Plea Agreement,

whether they intended to immunize Florida West or its employees and the meaning of the term "subsidiary" as used in the Plea Agreement.

We reach our conclusions based predominately on the facts presented during the evidentiary hearing. Hidalgo convincingly proffered evidence to support the factual assertion that 1) he was an executive of *both* LAN Cargo and Florida West; and 2) LAN Cargo exercised actual control over Florida West. On rebuttal, the Government failed to impeach Hidalgo (or his witnesses) or proffer sufficient independent evidence (through its witnesses or documents) to discredit Hidalgo's factual assertions. In fact, the Government's witnesses partially *corroborated* Hidalgo's position.[4] After considering the entire record, the overwhelming weight of evidence supports the finding that Hidalgo was a LAN Cargo executive and that LAN Cargo controlled Florida West.

      i.     *Did LAN Cargo Employ Hidalgo?* [5]

At a minimum, Hidalgo makes a prima facie showing of employment. At the evidentiary hearing, Hidalgo testified that he was a LAN Cargo executive during the indictment period. [D.E. 183, August 22, 2011 hearing transcript, Hidalgo 44:17-20,

---

[4] As discussed further below, the Government moved to re-open the evidentiary hearing and submitted four supporting affidavits, which we have considered in addition to the hearing evidence. [D.E. 158]. Notably, these affidavits, Paul Gartlan's in particular, *also* support Hidalgo's factual assertions.

[5] The Plea Agreement provides immunity to any current or former director, officer, or employee of LAN Cargo. Hidalgo asserts he was a LAN Cargo executive. Because the Plea Agreement merely requires employment, unless otherwise using Hidalgo's words, we will refer to the all-inclusive term "employee" or "employment" for convenience.

96:21-23, 161:8-20; Leonard 31:23-24 (Rodrigo was "a top person at LAN Cargo")].[6]

Hidalgo grew up in Chile with the owners of LAN, whom he met as a schoolboy, and

he spent his entire professional life working with them. Hidalgo 36:25-37:6.  Hidalgo's

role for LAN Cargo was to develop the air cargo business and operate various of its

subsidiaries, and as such he was assigned by LAN Cargo from subsidiary to subsidiary.

He did not have the option as to where he was assigned, 98:1-10, but rather went

where his employer, LAN Cargo, required him to go.  Hidalgo started his career in

1989 working for Fast Air, then briefly went to LAN Cargo in 1997, then Florida West

in until 1998, SFAC until 2002 and finally Florida West until 2007.  Hidalgo 39:9-19

(Fast Air to LAN Cargo), 40:25-41:5 (LAN Cargo to Florida West), 43:11-15 (Florida

West to SFAC), 44:14-17 (SFAC to Florida West); *see also* Leonard 27:1-4 (Hidalgo was

reassigned to Florida West by "top management, in that case LAN Cargo"), 28:19-20

("The only thing I know is that he was transferred to Florida West to develop Florida

West.").  Thus, LAN Cargo controlled which position Hidalgo held and when he would

hold it.

Further, because he was sent abroad, Hidalgo was considered an "expatriado,"

53:15-16; D. Ex. 12, i.e., a label given only to LAN Cargo employees who were assigned

to a particular company, but who still reported to LAN Cargo and received LAN Cargo

---

[6] The August 22 and 23, 2011 hearing transcripts are listed on the docket at D.E.
183 and 184, respectively.  Hereinafter, reference to testimony from either transcript
will be by shorthand and take the form: date, witness and page/line.  Thus, for
example, [D.E. 183, August 22, 2011 hearing transcript, Hidalgo 44:17-20, 96:21-23,
161:8-20] is "8/22 Tr. Hidalgo 44:17-20, 96:21-23, 161:8-20."

benefits. *See* Faret 33:16-23; Hidalgo 53:8-14.  As multiple witnesses testified, LAN Cargo's CEO Armando Valdivieso ("Valdivieso") was Hidalgo's immediate boss for nearly the entire indictment period. 8/22 Tr. Cuda 5:17-19, 7:1-2; Silva 19:9-16; Leonard 26:15-21.[7]

Hidalgo testified that he undertook work responsibilities relating to LAN Cargo that were separate from his responsibilities to either SFAC or Florida West; he referenced numerous reports and emails to support this contention.  These documents related to LAN Cargo's performance and other confidential information that were shared only with high level LAN Cargo executives.  Hidalgo 66:22-67:17; *see, e.g.*, D. Ex. 14, 16, 19, 94, 245.  Importantly, these LAN Cargo materials were not shared with Florida West's CEO Mansour Rasvanad ("Rasvanad") because, accordingly to Hidalgo, Rasvanad was not a LAN Cargo executive (unlike Hidalgo).  Hidalgo 67:11-17; 94:1-3. Moreover, Hidalgo negotiated and entered into contracts on behalf of LAN Cargo, not merely Florida West. *E.g.*, D. Ex. 211 and Hidalgo 78:18–79:8 (negotiating a warehouse contract for the benefit of the companies in the LAN Cargo group); D. Ex. 46 and Hidalgo 79:20–80:11 (discussing Hidalgo dividing up usage of airplanes between LAN Cargo and Florida West); Hidalgo 162:7-16 (explaining that he entered into contracts on behalf of LAN Cargo).  To facilitate his functions, Hidalgo often met with top LAN Cargo executives at LAN Cargo's office regarding LAN Cargo business. *Id.* 62:3-8;

---

[7] Christian Ureta became LAN Cargo's CEO in "January 2006." Thus, at most, he was LAN Cargo's CEO for the final six weeks of the indictment period. *See* [D.E. 158-1 at 4].

Leonard 33:14-24.    Moreover, customers, third parties, and other LAN employees considered Hidalgo a LAN Cargo executive. D. Ex. 190, 210; Haubold 188:9-24, 189:19-22; Hidalgo 55:19-24.

Another factor that bolsters Hidalgo's factual assertion is that LAN Cargo dictated his compensation package.  LAN Cargo's CEO Valdivieso set his salary, bonus and benefit structure, *see* Hidalgo 54:13–55:6; 162:2-8, which was similar to other LAN Cargo executives. *Id.* at 59:5-22.   LAN Cargo, rather than Florida West, paid him substantial annual bonuses. *See* D. Exs. 4, 5, 6, 7 (receipts of payments from LAN Cargo (2003) and Professional Aviation Management, LLC ("PAM") (2004-2006)); Hidalgo 60:5–61:59:7, 158:3-10 (Hidalgo testified that the bonuses were based on LAN Cargo's performance – not Florida West's – as compensation for his work as a LAN Cargo executive).  Moreover, the evidence suggests that his bonus payments were independent of Florida West because, according to Hidalgo, they could increase when Florida West suffered losses, *see* 8/22 Hidalgo 60:15–61:7, and were received without the knowledge of Florida West's CEO Rasvanad. *Id.* at 101:23–102:21.  And, finally, Hidalgo received the same benefits as other LAN Cargo executives (such as stock options, flights, insurance, vacation). D. Ex. 7, 8, 9, 12, 58; Hidalgo 58:7–59:3, 73:7-12 (invited to LAN Cargo parties).

Hidalgo explains that he had to conceal his employment relationship with LAN Cargo from the public because, by broadcasting his status as a LAN Cargo executive, he could raise suspicions that LAN Cargo (a foreign airline) controlled Florida West (a domestic air cargo carrier) in contravention of 49 U.S.C. §§ 41101(a)(1), 41102(a),

40102(a)(2) of the Federal Aviation Act. *See* n.11, *infra*; Hidalgo 56:22–57:23 (publicly concealed his LAN Cargo employment), 60:5-15 (LAN Cargo bonuses kept confidential). Indeed, in context with that federal law and evidence that LAN Cargo actually controlled Florida West, *see* B.ii., *infra*, Hidalgo's theory is plausible. As such, Hidalgo maintains that when viewed altogether, the evidence establishes that he was a LAN Cargo employee during the indictment period.

In response, the Government attacks Hidalgo's factual proffer in two main respects: 1) by impeaching the testimony of Hidalgo and his supporting witnesses and 2) calling rebuttal witnesses Martinez and Haubold. And, to a lesser degree, the Government subsequently submitted rebuttal affidavits. In each respect, however, the Government fails to debunk Hidalgo's dual employment theory, discredit the testimony of Hidalgo (or his witnesses) or present admissible evidence to support its rebuttal position.

First, the Government attempts to discredit Hidalgo's assertion that he was a LAN Cargo executive. In so doing, it focuses on specific instances where Hidalgo held himself out as a Florida West executive and maintained an image with the public that he worked solely for that company. *See* Hidalgo 25:23–26:16 (referencing an email in which Hidalgo stated that Florida West is a separate and independent airline); 133:3-18 (Hidalgo explains that a customer who wants to do business with LAN Cargo, and thus fly separate routes, must contact LAN Cargo as opposed to Florida West); 104:22-25 (Hidalgo told the government he worked for Florida West); 112:2–113:1 (Hidalgo admits to carrying a Florida West, not a LAN Cargo, business card). However, we find

12

the Government's position unavailing because it is predicated on the assumption that Hidalgo cannot simultaneously work for both LAN Cargo <u>and</u> Florida West. Yet, this is precisely Hidalgo's argument.[8]  Moreover, because Hidalgo maintains that the nature of his LAN Cargo employment was confidential, it naturally follows that he would not hold himself out to the public as a LAN Cargo employee.

Even though Hidalgo held himself out as a Florida West employee, Hidalgo's witnesses substantially corroborate that he was a LAN Cargo executive.  These witnesses testified based on their personal knowledge of how Hidalgo interacted with LAN Cargo's Valdivieso and operated between Florida West and LAN Cargo to support Hidalgo's position.  The Government attempts to minimize their testimony, however, by noting they lack direct personal knowledge regarding Hidalgo's LAN Cargo employment status.  This is expected though – they do not represent LAN Cargo.  But, their testimony still supports the factual assertion that Hidalgo held a unique position, apart from their Florida West counterparts, and that he specifically interacted with LAN Cargo.  As such, we credit their testimony and find it corroborates Hidalgo's position.

Next, the Government called rebuttal witnesses Martinez and Haubold. Between these two, only Martinez provided testimony relevant to Hidalgo's

---

[8]  As a general matter, an individual may hold dual positions within related companies. *See, e.g., In re Bank United Financial Corp.,* 442 B.R. 49, 54 (Bankr. S.D. Fla. 2010) (dual capacity as directors); *Trans-serve, Inc. v. United States*, No. Civ. A. 00-1017, 2004 WL 1157412, at *3 (W.D. La. Mar. 30, 2004) (common directors and officers). In fact, Ernesto Ramirez did just that. *See* D.E. [158-4 at 1 (simultaneously held positions as one of LAN Cargo's vice presidents and a director of Florida West)].

employment argument.  Haubold (who testified regarding control) explained that Hidalgo was always "affiliated" with LAN Cargo and that Florida West operated as a LAN company, but he provided no testimony with respect to whether Hidalgo was (or was not) an executive of LAN Cargo. 8/22 Tr. Haubold 174:14–175:10.  Turning to Martinez, she was LAN Cargo's payroll and benefits manager during the relevant period.  Martinez testified that LAN Cargo ceased making payments to Hidalgo when he left SFAC and moved to Florida West in mid-2002 because LAN Cargo was not responsible for Florida West's payroll.  8/22 Tr. Martinez 204:8-14.  She further testified that she was unaware of any bonus payments made by LAN Cargo or LAN to Hidalgo through LAN Cargo's payroll after July 2002. *Id.* 210:2-14.

However, while we credit her testimony, the record makes clear that Martinez served an exclusively administrative function for LAN Cargo and that, in such a role, Martinez would not have otherwise known of Hidalgo's unique position within LAN Cargo.  Moreover, by testifying that Hidalgo's payments (if made) did not pass through LAN Cargo's payroll, Martinez's testimony fails to rebut Hidalgo's position.  Indeed, Hidalgo specifically contends that his bonuses were paid through a third-party vendor PAM, not LAN Cargo.  Thus, tempered by these facts, Martinez's testimony that Hidalgo was not a LAN Cargo employee based on payroll records is unconvincing.

Beyond Martinez, the Government failed to offer any additional testimony to rebut Hidalgo's LAN Cargo employment argument.  The Government chose not to call a single LAN Cargo, LAN, Florida West or PAM executive to refute Hidalgo's testimony even though, as it turns out, Ernesto Ramirez ("Ramirez"), a LAN Cargo

Executive and Florida West board member, was physically present at the courthouse during both days of the evidentiary hearing. *See* 8/23 Tr. 214:23–215:20.  Moreover, Paul Gartlan ("Gartlan"), PAM's owner and CEO, is a local Miami resident whose attorney was also physically present in the courtroom during both days of the evidentiary hearing. *See* 8/22 Tr. 3:17-19; 8/23 Tr. 3:15-16.[9]

After the hearing, the Government submitted affidavits to rebut the hearing evidence.  Strikingly, the Government relied on affidavits from *Ramirez* and *Gartlan*. [D.E. 158-3,4].  Their affidavits, and specifically Gartlan's, corroborate rather than refute Hidalgo's position regarding his bonus.  Indeed,  Gartlan explains that his limited records inconclusively elucidate the specific purpose of Hidalgo's payments. Yet, he attests that PAM is in the business of, in part, paying bonuses, that Hidalgo submitted the invoices to PAM, that *Ramirez* (a LAN Cargo executive) approved the payments, and that *LAN* reimbursed PAM for the payments. [158-3].  Thus, the argument that LAN Cargo paid Hidalgo a bonus in 2005, 2006 and 2007 is uncontradicted.

In sum, Hidalgo presents evidence of an entire career within the LAN Cargo organization, direct and anecdotal evidence of his specific involvement with LAN Cargo decisions, dominion by his LAN Cargo superior regarding specific employment and direct control by LAN Cargo over his compensation package.  With that said, and while we credit Hidalgo's testimony (and that of his witnesses), the evidence is qualified by

---

[9] The record is unclear as to whether Gartlan was physically present in the courthouse during the evidentiary hearing, but it is possible too.

the self-serving nature of Hidalgo's testimony and his witnesses' incomplete knowledge as to his employment (as they are not LAN Cargo representatives). Plus, the Government presents some evidence to supports its position that Hidalgo worked for Florida West only. But, on balance, after weighing all available credible testimony and evidence, we find that the factual scale tips in Hidalgo's favor on this issue. Ultimately, the finding that Hidalgo presents prima facie evidence that he was a LAN Cargo employee is bolstered by the Government's inability to establish otherwise. Indeed, if Hidalgo's position is false, the Government should have been readily able to rebut the contention; the fact that this feat proved unsurmountable is telling.

### ii. *Did LAN Cargo Exercise Actual Control over Florida West?*

As noted above, paragraph 15(a) of the Plea Agreement immunizes employees of LAN Cargo's subsidiaries. It is undisputed that Hidalgo was a Florida West executive during the indictment period. Therefore, the issue turns on whether Florida West was a subsidiary of LAN Cargo. The Government and Defendants advance divergent interpretations of the undefined term "subsidiary." The Government contends that majority ownership is a prerequisite, while the Defendants argue that a combination of ownership and actual control is sufficient. Leaving the legal question aside, from a factual standpoint, the dispositive inquiry is whether LAN Cargo exercised actual control over Florida West during the indictment period. Moreover, aside from the subsidiary context, this issue is also relevant tangentially to Hidalgo's LAN Cargo employment status. *See* I.B.i., *supra*.

16

Hidalgo contends that LAN Cargo controlled Florida West's strategic "big picture" decisions through Hidalgo, as a LAN Cargo executive. *See* Hidalgo 49:2-8; Leonard 33:8-9. This level of control, Hidalgo contends, comports with LAN Cargo's position of control within the LAN corporation. LAN Cargo was responsible for LAN's cargo division and LAN Cargo's executives controlled, from a strategic big picture perspective, the entire "LAN Cargo Group," which included ABSA, MAS Air, SFAC and Florida West. While LAN Cargo only owned 25% of Florida West,[10] Hidalgo argues that it treated Florida West identically as its wholly-owned subsidiaries ABSA, MAS Air and SFAC. However, due to a federal statute restricting foreign ownership of a domestic airline, LAN Cargo could technically hold only a minority interest. 8/22 Tr. Hidalgo 48:12-17; 8/23 Tr. Dick 109:5-22.[11] Nevertheless, Hidalgo argues that while

---

[10] A question arose whether LAN Cargo or LAN owned a 25% interest in Florida West. Initially, the Parties agreed that it was LAN. [D.E. 64 at 4; D.E. 76 at 8; D.E. 106-1; D.E. 94 at 4]. Later, it came to bear that, in reality, LAN's wholly-owned subsidiary LAN Cargo held the 25% interest in Florida West. And, LAN Cargo owned its interest through two of its own wholly-owned subsidiaries. *See* 8/23 Tr. 124:2-17. (This testimony was objected to on hearsay grounds. The objection was sustained at the hearing. *Id.* However, this testimony from LAN Cargo's attorney was corroborated reliable, admissible evidence. *See* [D.E. 158-4]. Therefore, in light of the corroborating evidence, we conclude his testimony is admissible. *See United States v. Rodriguez*, 218 F.3d 1243, 1246 (11th Cir. 2000) (hearsay testimony admissible under the catch-all exception because corroborated by admissible documents); *see also United States v. Hathaway*, No. 08-80077-CR-Hurley, 2011 WL 5320985, at * 2 (S.D. Fla. Oct. 18, 2011) (hearsay admissible if corroborated by sufficiently reliable admissible evidence)).

[11] The Federal Aviation Act, as amended, maintains that in order to provide air transportation, an air carrier must hold a certificate of public convenience, which can only be issued to a citizen of the United States. *See* 49 U.S.C. §§ 41101(a)(1), 41102(a), 40102(a)(2). The crucial inquiry rests on who or what is considered a "citizen of the United States," defined in the current statute as: (A) an individual who is a citizen of the United States; (B) a partnership each of whose partners is an individual who is a

LAN Cargo was extremely concerned with the *appearance* of control (and thus kept his LAN Cargo position confidential), it was not concerned about the actual exercise of control. *Id.* at 57:2-15, 95:18-22; Silva 18:24–19:3 ("I was advised by Hidalgo that the airline was controlled by LAN but the public could not perceive it that way."). Therefore, similar to SFAC, ABSA and MAS Air, LAN Cargo controlled important decisions relating to Florida West's planning, routes and legal decisions. Hidalgo 49:2-8. Hidalgo, his witnesses and numerous emails and communications between Hidalgo and LAN Cargo executives support his control argument. *See, e.g.*, 49:9-13 (Hidalgo affirms that "hundreds if not thousands" of such emails exist); D. Exs. 18, 21, 22, 23, 28, 29, 31, 32, 35, 72, 86, 105, 110, 113, 117, 141, 157, 167, 221A, 249, 254.

One such example of control relates to LAN Cargo's involvement with Florida West's competitors and cost issues. *See* Hidalgo 69:1–70:5, D. Ex. 22 (email from Hidalgo to three LAN Cargo executives informing them that "we" have to pay attention to a potential competitor that may begin servicing "Central America as well as South America" and that "[t]his is a threat <u>we</u> have to assess."), Exs. 18, 21, 23, 105; and

---

citizen of the United States; or (C) a corporation or association organized under the laws of the United States or a State . . . of the United States, of which the president and at least two-thirds of the board of directors and other managing officers are citizens of the United States, which is under the actual control of citizens of the United States, and in which at least 75 percent of the voting interest is owned or controlled by persons that are citizens of the United States. *Id.* at § 40102(a)(15). Thus, under this definition, foreign persons and corporations can hold no more than 25 percent of the voting shares of a U.S. airline. *See generally* Josh Cavinato, Note, *Turbulence in the Airline Industry: Rethinking America's Foreign Ownership Restrictions*, 81 S. Cal. L. Rev. 311, 315-16 (2008). For this reason, LAN Cargo could only own 25% of Florida West. We took judicial notice of this law during the hearing. *See* 8/22 Tr. 48:18-25; D. Ex. 59, 60.

Hidalgo 65:11–66:7, D. Ex. 29 (in response to an email relating to "U.S. Custom and Border operations and costs" sent to Hidalgo and multiple LAN Cargo executives (but not Rasnavad), LAN Cargo's CEO Valdivieso directs Hidalgo to meet with him to "coordinate on how to tackle this issue").

Moreover, the record evidence is replete with other examples of how LAN Cargo controlled both major and minor strategic decisions for Florida West, including: routes,[12] airplanes,[13] rates,[14] sales,[15] hiring/staffing,[16] legal,[17]

---

[12] LAN Cargo controlled what routes to run and what routes to stop running. *See, e.g.,* 8/22 Silva 13:9-21, 14:2–16:3, 20:11–21:18; Hidalgo 86:1–87:3; *see also* D. Ex. 31 (LAN Cargo's CEO Valdivieso, and not Florida West's CEO Rasnavad, approved Florida West's service of new routes to El Salvador and Honduras and then terminated these routes three months later because they were unprofitable).

[13] Florida West shared airplanes that it rented with LAN Cargo and vice versa. Hidalgo 53:19–54:5; Silva 23:5-21.

[14] Interline rates set for all members of the LAN Cargo group, including Florida West, were set by LAN Cargo without negotiating with Florida West. Hidalgo 70:14:24. Even if this is a common practice in the industry, as the Government contends, it still shows a degree of influence wielded by LAN Cargo over Florida West.

[15] LAN Cargo provided Florida West with sale leads and instructed it on how much to charge. Hidalgo 72:14–74:1; D. Ex. 50 (email from Claudio Silva suggesting Florida West should handle a charter to Canada even though, according to Hidalgo's response "it is more than 5 hours" from its normal route and that, as a result, "we are not very competitive on that route."); 51, 97 (additional leads that Claudio Silva emailed to Hidalgo).

[16] LAN Cargo directs where and when employees will work for the various group companies, including Florida West. Hidalgo 39:9-19 (Fast Air to LAN Cargo); 40:25-41:5 (LAN Cargo to Florida West); 43:11-15 (Florida West to SFAC); 44:14-17 (SFAC to Florida West); Cuda 8:3-13 (Hidalgo hired Cuda and worked at SFAC until Cuda met the CEO of PAM, Gartlan (who Cuda interestingly enough described as the "head of personal for all LAN companies"), who explained SFAC was closing and that he would be working at Florida West); Leonard 28:1–29:18 (Hidalgo hired Leonard as his right hand man with SFAC, but he remained with SFAC after Hidalgo transferred to

scheduling,[18] budgeting,[19] training,[20] accounting,[21] and insurance.[22]

In isolation, these individual factors are insufficient to support a factual finding of control.  However, when viewed together, in light of the testimony and documents provided, Hidalgo establishes, at a minimum, a prima facie showing that LAN Cargo

_____

Florida West at the direction of Valdivieso).

[17] LAN Cargo's lawyer reviewed, drafted and negotiated Florida West's contracts. Hidalgo 51:3-12, 52:22–53:12, 83:1-22; D. Ex. 110 (email  chain regarding a contract between Florida West and a third party.  The first email is from LAN's U.S. Counsel to Ramirez and then from Ramirez to Hidalgo to be approved by Florida West.  Put differently, Florida West's contract was, at a minimum, reviewed by LAN's counsel and LAN Cargo's executive before Florida West had an opportunity to approve the contract); *see also* Ex. 113 (email from LAN's U.S. counsel to Ramirez to review comments on a Florida West contract that "should not be sent to [Florida West]" because "they are for your approval"); 157 (Hidalgo and Ramirez discuss permits).

[18] LAN Cargo coordinated flight schedules for the group companies, including Florida West. *See* 8/22 Tr. Hidalgo 74:3-16, 82:2-22; D. Exs. 95, 98 (emails sent from LAN to the various cargo subsidiaries (and Florida West) informing them of their schedule); 167 (another aircraft planning email sent among all of LAN's air cargo companies, including Florida West). Silva 22:12–23:4 (Florida West had to coordinate flights through LAN Cargo).

[19] Like its wholly-owned subsidiaries, LAN Cargo participated in the budgeting for Florida West, MAS Air and ABSA. Hidalgo 74:17–75:4; D. Ex. 40 (email from LAN discussing the budget of LAN Cargo sales and indicating the flights for each of its cargo companies, including Florida West).

[20] LAN Cargo coordinated training for Florida West. Hidalgo 76:8-20; D. Ex. 72 (email from LAN to Hidalgo scheduling training and discussing how Florida West will be taking over certain MAS Air responsibilities).

[21] LAN Cargo handled Florida West's accounting until LAN decided a third party, Air Stream, should handle the accounting for each of the cargo companies. Hidalgo 77:5-23.

[22] Florida West was under LAN Cargo's umbrella insurance. Hidalgo 77:24–78:16; D. Ex. 44 (email from LAN to Hidalgo requesting information to secure insurance for Florida West as well as the other "Group" companies).

exercised actual control over Florida West throughout the indictment period.  Indeed, LAN Cargo controlled (or significantly influenced) nearly every facet of Florida West.

In addition to these examples, Hidalgo argues control by way of analogy too. Hidalgo argues that Florida West was created to provide direct carrier services that its predecessor company SFAC provided as an indirect carrier.  In effect, that Florida West succeeded SFAC, which was a wholly owned LAN Cargo subsidiary.  The testimony establishes that Florida West operated in exactly the same way as SFAC, with the same sales team servicing the same area and providing services to the same customers.  Except for a change in paperwork and the company name listed on the airway bill, SFAC and Florida West (in the eyes of the market) were indistinguishable. *See* Hidalgo 43:13-24, 116:1-9; Haubold 183:17–184:10 (testified that other than the name change, Florida West was the same as its predecessor company SFAC); *see also* Cuda 8:8-25 (explaining that employees of SFAC received the same benefits as employees of Florida West).  Moreover, the Government concedes that there was no material difference between SFAC and Florida West. *See* 8/23 Tr. Gallagher 187:11-20.

Relevant to this analogy, Hidalgo further presents evidence relating to the "LAN Cargo Group."  Hidalgo, his four witnesses and the Government's witness Haubold each testified about a network of airlines that operated for and were controlled by LAN Cargo's executives.  At a minimum, this group of airlines included SFAC (its successor Florida West), ABSA and MAS Air.  LAN Cargo treated each of these companies the same and these companies operated for a single purpose – to further LAN Cargo. Hidalgo 41:3–42:10, 143:24–145:7, 156:16–157:1; Cuda 9:3-12; 12:9-11 ("As far as I was

21

concerned we were all working for one group ... [t]he LAN Group."); Silva 13:24–14:1 (In 2004, the "group of companies of LAN ... was ABSA from Brazil, was MAS Air from Mexico.   It was LAN Ecuador, LAN Chile and Florida West."); Faret 34:24–35:8 (Florida West, ABSA, MAS Air are all part of the LAN Cargo "Group" and that Valdivieso was the CEO of this "Group."), 35:21-23 (LAN Cargo was the "boss" of the LAN Cargo Group companies); Haubold 182:25–183:7 ("The LAN Cargo Group is a network of different airlines in the region ... One of them is ABSA, one was MAS Air coming from Mexico, ... and one of them was Florida West as part of the network.").

Thus, as the analogy goes, if LAN Cargo controls the LAN Cargo Group, which includes various wholly-owned subsidiaries, and Florida West is part of the LAN Cargo Group, then LAN Cargo controls Florida West akin to a wholly-owned subsidiary irrespective of its technical minority ownership.

In response, the Government again seeks to rebut Hidalgo's position by discrediting his witnesses and calling a rebuttal witness, Joaquin Haubold.  However, the Government again fails in both respects.

Consistently, the Government cross-examined Hidalgo's witnesses on the issue of whether Florida West and LAN Cargo were the same or separate companies. Unvariably, they all concede that Florida West and LAN Cargo were separate entities, operating separate routes.  Cuda 11:17-22, Silva 25:23–26:19.  However, in the process, the Government bolstered Hidalgo's control argument.  For instance, the Government presented Jaime Silva with an email exchange that took place between Hidalgo and a dissatisfied customer.   Silva 24:15–27:12, Govt. Ex. 56.   In that email, Hidalgo

22

explained to the customer that Florida West and LAN Cargo are separate entities. *Id.* Silva testified that he agreed with the statement in Hidalgo's email and, more broadly, that Hidalgo was truthful.[23]

Silva, however, went on to qualify his testimony and explain that Florida West maintained a separate public and private persona due to a federal regulation. Silva 26:4-19. Silva completed his explanation by highlighting the dissatisfied customer's response to Hidalgo which stated, "if Florida West wishes to conclude this issue on a pure business level, Sovereign will likewise conduct its future business decisions in the same vein, and in so doing all commercial relations with ABSA, Florida West and LAN and MAS Air will cease from Brazil, Colombia, Guatemala and Peru." *See* 27:3-7, Govt. Ex. 56. Thus, this exchange supports the assertion that the LAN Cargo Group, including Florida West, operated as a single unit. Moreover, as Faret conceded during cross, while LAN Cargo Group may not officially exist, the group of parallel companies controlled by LAN Cargo (including Florida West) are know as the LAN Cargo Group. *Id.* at 36:14-25. Thus, the testimony elicited by the Government from these witnesses neither discredited their testimony nor rebutted Hidalgo's control argument.

Next, the Government called Haubold, its sole rebuttal witness on the control issue. Haubold, who was sequestered before testifying, provided the single most effective, compelling portion of testimony during the evidentiary hearing and

---

[23] The underlying question was whether Silva considered Hidalgo to be truthful. Silva 24:15–27:12.

unequivocally testified that LAN Cargo operated and exercised control over a network of airlines (including Florida West) known informally as the LAN Cargo Group.

Haubold worked for a consulting company that provided general sales agent ("GSA") services to various LAN Cargo group companies including LAN Cargo and Florida West.  As a GSA, Haubold provided these companies with local sales agents and received a commission from the sales. 8/22 Tr. Haubold 168:1-17, 170:15.

The Government called Haubold to specifically testify that Florida West and LAN Cargo were two separate companies. This was made clear during his direct examination: "Were your interactions always with an independent Florida West?" and "Your interactions were always with Florida West as an independent company, is that correct?" 8/23 Tr. Gallagher at 177:7-13.  While Haubold conceded that legally LAN Cargo and Florida West may be separate companies,[24] he testified that practically speaking LAN Cargo and Florida West were part of the same group and that Florida West was a dependent corporation.  He opined, "I don't know if there was a financial backing, but the impression it gave to us as agents is we could work with Florida West that *was referred to us by LAN internally*" ...; furthermore, "[i]n a commercial sense there was an understanding in the market[:] behind Florida West there was LAN." Haubold 176:15-24.  Also, Haubold made clear that together, these companies (LAN

---

[24] This point, however, is largely irrelevant.  Indeed, as a general matter of corporate law, parent and subsidiary corporations are considered separate entities. *See, e.g., Whetsone Candy Co., Inc. v. Kraft Foods, Inc.*, 351 F.3d 1067, 1074 (11th Cir. 2003) (Under Florida law, "[c]orporations are separate legal entities and contracts made by a parent corporation do not bind a subsidiary merely because one corporation owns all of the stock of the other corporation.").

Cargo, ABSA, MAS Air and Florida West) were known in the marketplace as the LAN Cargo group. *Id.* at 175:25–176:4.   Put differently, Haubold testified that the marketplace would not have conducted business with new entrant Florida West without the knowledge that LAN Cargo was the silent controller of Florida West – because LAN Cargo served this controlling role, the marketplace was comfortable and willing to work with Florida West. *Id.* 176:22-24.

Haubold maintained that the LAN Cargo Group was "a network of different airlines in the region that have managed to gain great credibility within Latin America, especially within Colombia, to provide a very good solid cargo service.  One of them was ABSA, one was MAS Air coming from Mexico, ... , and one of them was Florida West as part of the network." *Id.* at 183:1-7.  Moreover, he corroborated that SFAC became Florida West in 2002 and that other than changing certain paperwork, the company was considered the same within the marketplace and operated as the same. 183:17–184:10.  And, he agreed that Hidalgo was considered a "Chilean" or one of the individuals directly linked to the LAN Cargo Group along with other LAN Cargo executives, such as Valdivieso and Ramirez. *Id.* at 184:11-22.

Furthermore, Haubold discussed various emails that he sent to Hidalgo, Valdivieso and Ramirez discussing a variety of matters relating to Florida West *and* LAN Cargo.  Haubold at 185:1–196:23.  The emails clearly demonstrate that Haubold discussed Florida West issues with Hidalgo *and* LAN Cargo executives, but rarely (if ever) with Florida West's CEO Rasnavad.  Haubold186:21–196:22; *see* D. Ex. 18

(discussed a competitor with LAN Cargo executives and Hidalgo, but not Rasnavad); 142 (discussed a competitor airline of Florida West with Ramirez and Hidalgo, but not Rasnavad); 235 (discussing a cargo handling issue relating to LAN Cargo and Florida West with Hidalgo only); and 241 (discussing optimizing Florida West flights during the Mother's Day and Valentine's Day holiday with Hidalgo and LAN Cargo executives, but not Rasnavad). Haubold even testified that if he wanted to work for a competitor of Florida West, he would first need to receive LAN Cargo's approval. *Id.* at 185:1-10. This point is telling. Haubold testified that before he could engage a competitor of Florida West, he would first need to discuss this with LAN Cargo – a corporation the Government contends "[a]t most ... show[s] a business relationship common in the airline industry" that "demonstrate[s] nothing more than a limited, mutually-beneficial business relationship that did not compromise either company's *independent decision-making authority* or ability to act in its *own self-interest*." [D.E. 159 at 8-9]. In light of Haubold's testimony, however, this contention conflicts with reality.[25] Furthermore, it begs the question: if Florida West controlled its own destiny, and was controlled by its CEO Rasnavad (as the Government contends, [D.E. 159 at

---

[25] We find Haubold to be a credible witness for several reasons: 1) he was offered as a Government witness, but testified positively for Hidalgo; 2) he testified pursuant to a cooperation agreement contingent on his truthful testimony, *see* Haubold 167:5-7, and thus the likelihood that he would testify dishonestly and jeopardize his immunity is extremely small; and, 3) there is no record evidence to suggest bias.

4]) then why is there effectively no evidence of his involvement with Florida West's decisions?[26]  The Government fails to resolve this question in its favor.[27]

In sum, Hidalgo presents evidence that LAN Cargo operates as a figure head that controls a group of companies known informally as the LAN Cargo Group.  This "Group" consisted of LAN Cargo, ABSA, MAS Air and SFAC/Florida West.  The evidence Hidalgo proffers supports this factual assertion.  However, similar to this employment argument, much of his evidence suffers from a self-serving perspective or divergent conclusions (as in how his documents could be interpreted).  But, after weighing the quality of the evidence presented on both sides, tempered by Haubold's testimony and certain compelling examples of control (i.e. routes, competitors), we conclude that the totality of evidence supports Hidalgo's position.  Again, our ultimate conclusion that Hidalgo presents prima facie evidence that LAN Cargo exercises actual control over Florida West is bolstered by the Government's failure to rebut this argument with testimony from a LAN, LAN Cargo or Florida West representative.

---

[26] Again, Rasnavad was the CEO, president and majority owner of Florida West during the indictment period. *See* [D.E. 105 at 25:21-25; D.E. 106-1; 159 at 4].

[27] Subsequent to the evidentiary hearing, the Government submitted affidavits from LAN Cargo's current CEO, COO and Ramirez to rebut Hidalgo's control argument.  These affidavits are discussed in greater detail below, *see* II.F., *infra.*, but we conclude they are unpersuasive as conclusory, not based on personal knowledge or otherwise insufficient to rebut the control issue.

### iii.   Did the Plea Agreement's Drafters intend to Immunize <u>Florida West</u>?

The Parties were directed to present evidence discussing the intent of the drafters when LAN Cargo and the Government entered into the Plea Agreement. [D.E. 124]. The purpose of such evidence, of course, is to resolve ambiguity. However, because the Court concludes the Plea Agreement is unambiguous, this extrinsic evidence is irrelevant.[28]

## II.   LEGAL ANALYSIS

### A.   <u>Motion to Dismiss Standard</u>

Typically, the utility of a motion to dismiss an indictment is very limited. *See generally United States v. Pendergraft*, 297 F.3d 1198, 1204 (11th Cir. 2002); *United States v. Critzer,* 951 F.3d 306, 307 (11th Cir. 1992). However, when a defendant asserts the defense of immunity (which is the case here), a motion to dismiss is appropriate. *See United States v. Salman*, 378 F.3d 1266, 1267 n.3 (11th Cir. 2004); *United States v. San Pedro*, 781 F. Supp. 761 (S.D. Fla. 1991) (dismissing an indictment based on the immunity provision of a plea agreement).

Hidalgo and Florida West assert that the Government breached the Plea Agreement, which purportedly immunizes them from prosecution. The Plea Agreement's immunity provisions extend to the therein named signatory defendants LAN Cargo and ABSA, and certain classes of related individuals and corporations. By

---

[28] To the extent this issue is relevant, or is discussed elsewhere, the fact is that the drafters did not intend to include Florida West or its employees in either paragraph 14 or 15(a) of the Plea Agreement. 8/23 Tr. Grundvig 15:22–16-9; Dick  117:14-20.

its terms, deciding specifically which related individuals and corporations the Plea

Agreement immunizes turns on the undefined term "subsidiary."   Because the

undefined term raises interpretation concerns, we turn to principles of contract law to

affix its appropriate scope.  *United States v. Jefferies*, 908 F.2d 1520, 1523 (11th Cir.

1990) (commercial contract principles are applied to interpret and enforce plea

agreements).

### B.    *Governing Contract Principles*

In the process of analyzing plea agreements, courts have necessarily drawn on

the most relevant body of developed rules and principles of private law, those

pertaining to the formation and interpretation of commercial contracts. *See id.*; *Wilson*

*v. Washington,* 138 F.3d 647, 652 (7th Cir. 1998); *United States v. Fields,* 766 F.2d

1161, 1168 (7th Cir. 1985).  However, *Jefferies* cautioned that this analogy should not

be taken too far and summarized certain standards that apply to plea agreements:

> First, the court noted that a hyper-technical reading of the
> written agreement and a rigidly literal approach in the
> construction of language should not be accepted.  Second,
> the written agreement should be viewed against the
> background of the negotiations and should not be
> interpreted to directly contradic[t] an oral understanding.
> Finally, a plea agreement that is ambiguous must be read
> against the government.  The rational of this method of
> interpretation is that a plea agreement must be construed
> in light of the fact that it constitutes a waiver of substantial
> constitutional rights requiring that the defendant be
> adequately warned of the consequences of the plea.

908 F.2d at 1523 (citations and quotations omitted).

29

Hidalgo and Florida West are unnamed in the Plea Agreement.  As a result, this raises a preliminary matter as to whether Hidalgo and Florida West are intended third party beneficiaries and thus have standing to raise their breach arguments.  "Under Florida law, a third party is an intended beneficiary of a contract between two other parties only if a direct and primary object of the contracting parties was to confer a benefit on the third party." *Bochese v. Town of Ponce Inlet*, 405 F.3d 964, 982 (11th Cir. 2005) (citing Florida law); *Holbrook v. Pitt,* 643 F.2d 1261, 1270 (7th Cir.1981) ("Under settled principles of federal common law, a third party may have enforceable rights under a contract if the contract was made for his direct benefit.").  This benefit may extend to an individual third party or to a class of individuals that the third party belongs.  *See Bochese*, 405 F.3d at 982-83 (citing *Vencor Hosps. v. Blue Cross Blue Shield of R.I.*, 169 F.3d 677, 680 (11th Cir. 1999) and *Morgan Stanley DW, Inc. v. Halliday*, 873 So. 2d 400, 403 (Fla. 4th DCA 2004)).  Either way, the intent of the parties is the key to determining whether a third party is an intended beneficiary. *Bochese*, 405 F.3d at 981 (citing *Marianna Lime Prods. Co. v. McKay*, 147 So. 264, 265 (1933)); *Int'l Erectors, Inc. v. Wilhoit Steel Erectors & Rental Serv.*, 400 F.2d 465, 471 (5th Cir. 1968) ("The Florida courts require that there must have been an intent to benefit the third party at the time the promisor and promisee entered into the contract in order for the third party to be classified as [a beneficiary].  If no such intention to benefit is found *in the contract*, the third party is an incidental beneficiary and has no

rights enforceable against the promisor under the contract." (citations omitted, emphasis added)).[29]

Here, because neither Hidalgo or Florida West are mentioned by name, the question is whether LAN Cargo, ABSA and the Government entered into the Plea Agreement for the direct and substantial purpose of conferring a benefit on a class of individuals that either Hidalgo or Florida West belong. Based on the express terms of paragraphs 14 and 15(a), the signatory parties unmistakably intended to confer immunity on a discrete class of corporations and individuals in addition to LAN Cargo and ABSA that could include the Defendants. *See Bochese*, 405 F.3d at 982-83 (citing *American Sur. Co. of New York v. Smith*, 130 So. 440, 441 (Fla. 1930) ("Where, therefore, it is manifest from the nature or terms of a contract that the formal parties thereto intended its provisions to be for the benefit of a third party, as well as for the benefit of the formal parties themselves, the benefit to such third party being the direct and primary object of the contract, *or amongst such objects*, such third party may maintain an action on the contract even though he be a stranger to the consideration.")) (emphasis added).

The plea agreement unquestionably conferred a direct benefit on a class of individuals: immunity. Moreover, the Plea Agreement evinced an intent to extend this benefit to a definable class of third parties: employees of a LAN Cargo, employees of

---

[29] In *Bonner v. City of Prichard,* 661 F.2d 1206, 1209 (11th Cir.1981) (en banc), this Court adopted as binding precedent all decisions of the former Fifth Circuit handed down prior to close of business on September 30, 1981.

LAN Cargo's subsidiaries, and subsidiary corporations of LAN Cargo and ABSA. *Vencor Hosps.*, for instance, concluded that the plaintiff was an intended third party beneficiary because the contract stated "benefit payments may be made to the ... 'hospital'" and because that plaintiff hospital had received "benefit payments" it was conferred a benefit. 169 F.3d at 680.  Here, the facts are more compelling because the plea agreement language defines a finite and identifiable class of corporations and individuals that are specifically related to the signatory defendants.  *But see Bochese*, 405 F.3d at 983 (concluding plaintiff was not a third party beneficiary because the contract gave no indication that plaintiff individually, or a class of individuals in which plaintiff would belong, was intended to receive a benefit.).   Accordingly, as a preliminary matter, we conclude that Hidalgo and Florida West have third party beneficiary standing necessary to establish their immunity under the Plea Agreement (assuming, of course, they fall within this category of beneficiaries).

## C.   *Hidalgo's Motion to Dismiss Should be Granted*

Hidalgo advances two meritorious arguments to support his immunity position. First, that LAN Cargo employed him.  This inquiry largely presents an issue of fact resolved by the Court relying on record evidence and guidance from helpful case law. Second, that he was an employee of two LAN Cargo subsidiaries: SFAC and Florida West.  The second inquiry presents a more difficult question and asks whether Florida West is a subsidiary of LAN Cargo based on its 25% minority ownership and exercise of actual control.  This latter inquiry presents a mixed question of fact and law.  We discuss each in turn.

### i.    *Hidalgo is a LAN Cargo Employee*

Hidalgo and the Government dispute whether he was a LAN Cargo employee. Each party relies largely on the record developed during the evidentiary hearing to support their respective positions.[30]   The evidence Hidalgo submits to support his argument is: 1) he always worked *simultaneously* for LAN Cargo and one of its subsidiaries; 2) he had work responsibilities for LAN Cargo that were unrelated to his work for the subsidiaries; 3) LAN Cargo's CEO Valdivieso set his salary; 4) LAN Cargo paid him annual bonuses separate and apart from Florida West; and 5) he received the same benefits as a LAN Cargo executive while he was purportedly working merely as a Florida West employee. [D.E. 157 at 2-4].

The Government counters arguing that Hidalgo: 1) worked for Florida West only; 2) did not hold himself out as a LAN Cargo employee to others in the airline industry; 3) told customers and the government that he was employed by Florida West; 4) ceased receiving payments from LAN Cargo's payroll in 2002 when he left SFAC; 5) held no title at LAN Cargo; 6) did not appear on a LAN Cargo organizational chart; 7) did not carry a LAN Cargo business card; and 7) never sent or received email from a LAN Cargo email address. [D.E. 159 at 3; 168 at 6-8].

---

[30] The Government supplements its argument with affidavits secured *after* the evidentiary hearing.  As noted above, the Court will weigh this evidence solely in the interest of justice. However, to be sure, unlike the Government's characterization, the Court invited the Government to submit such affidavits to convince the Court whether it should reopen the evidentiary hearing, not to to supplement the evidentiary record. *See* 8/23 Tr. 232:15–233:5.

If we accept each of these factors as true (which the record supports), Hidalgo's dual employment position prevails. Indeed, it would be illogical for Hidalgo to hold himself out as a LAN Cargo employee, appear on a LAN Cargo organizational chart, carry a LAN Cargo business card or appear on LAN Cargo's payroll if the relationship was intentional concealed to objectively comply with the Federal Aviation Act. The corollary, of course, is that Hidalgo is expected to hold himself out as a Florida West employee. All of these factors comport with the premise that Hidalgo's position was private, known only internally. In this vain, the thrust of the Government's argument with respect to work performed or not performed solely for LAN Cargo loses its effect due to the overwhelming evidence that work performed by Florida West (as well as the other LAN Cargo subsidiaries) always benefitted LAN Cargo. Simply because Hidalgo worked for Florida West, this does not establish as a matter of law that his actions were not for LAN Cargo's benefit and at LAN Cargo's control. This is especially so in light of the evidence relating to the LAN Cargo Group. Moreover, as Haubold testified, Hidalgo also provided a direct benefit to LAN Cargo. 8/22 Tr. Haubold 188-189.

To be sure, Hidalgo does not argue that he served as a specific LAN Cargo officer with a distinct role and specific job description. Hidalgo argues, instead, that he served as *both* a LAN Cargo executive and Florida West executive. And the evidence he proffered demonstrates that Hidalgo indeed acted as an emissary between the decision-making LAN Cargo "brain" and its functional Florida West "body." The Government flatly disputes this position; largely as based on self-serving evidence and an implausible theory. However, the record syncs with this theory. As a result, much of

34

the characteristics the Government contends are probative of an employment relationship, i.e., title, business card, organizational chart, and payroll, are inapposite in this atypical situation.

Although neither party cites a single case to support their respective positions, we find a review of case law and statutes dealing with employer-employee relationships is helpful.  This area of jurisprudence demonstrates common indices of an employment relationship that are relevant to this situation including, but not limited to: control; supervision; power to determine pay rate or method of pay; right to (directly or indirectly) hire, fire, or modify employment conditions; preparation of payroll or payment of wages; provision of employees benefits; tax treatment of the employee; duration of the relationship; and, whether the hiring party has the right to assign additional duties. *See, e.g., Nationwide Mut. Ins. Co. v. Darden*, 503 U.S. 318, 323 (1992) (defining a "common-law test for determining who qualifies as an 'employee,'" applied in various contexts); *Berrocal v. Moody Petroleum, Inc.*, No. 07-22549-CIV, 2010 WL 1372410, at *9-10 (S.D. Fla. Mar. 31, 2010) (discussing relevant employment characteristics in the employee-joint employer Fair Labor Standards Act context); Restatement (Second) of Agency § 220(2) (1958) (listing nonexhaustive criteria for identifying master-servant relationship); Rev. Rul. 87-41, 1987-1 Cum. Bull. 296, 298-299 (setting forth 20 factors as guides in determining whether an individual qualifies as a common-law "employee" in various tax law contexts).

As discussed earlier, Hidalgo demonstrates that several of these characteristics apply to his LAN Cargo employment.  However, in light of the undefined, amorphous

nature of Hidalgo's position, we find the evidence relating to his compensation package the most probative.  Hidalgo contends that LAN Cargo either determined or paid his salary, bonus and benefits during the indictment period.  As for his salary, Florida West paid him (this is undisputed); nevertheless, Hidalgo contends that LAN Cargo set the actual amount.  The Government presents <u>no evidence</u> to rebut this testimony including, but not limited to, Rasnavad, Valdivieso, Ernesto, Ureta or Germani.[31]  Nevertheless, the ability to set an individual's salary is a recognized example of control and, thus, an employment relationship. *See id.*

Next, Hidalgo contends that PAM's payments of at least $75,000 in 2005, 2006 and 2007 represent bonus payments from LAN Cargo.  Again, the Government presents no evidence to rebut this specific claim (as discussed above, Martinez's payroll testimony fails).  The Government first half-heartedly attempts to characterize them as "severance" payments, which Hidalgo emphatically denied. Hidalgo 164:22–165:1.  Later, the Government submits new evidence and affidavits from Ureta and Gartlan that discuss this issue.  Abandoning the severance argument, Ureta unconvincingly attests that during his tenure (2006 forward) he had "no knowledge" of payments to Hidalgo from "LAN/LAN Cargo" or any amounts "budgeted" for Hidalgo. [D.E. 159-1].

---

[31] The Government attempts to make a significant point that the *only* person able to corroborate Hidalgo's position is Valdivieso, a Chilean resident who is unlikely to testify (because he is carved out of the Plea Agreement).  We reject the Government's implication that Valdivieso's unavailability equates to Hidalgo's untruthfulness.  Rather, the point is more telling from the perspective of the Government and its inability to present a single LAN Cargo witness – *all of whom were immunized* – to rebut Hidalgo's testimony.  This fact significantly weighs in Hidalgo's favor.

Yet, technically, his affidavit fails to specifically rebut Hidalgo's position outright because in fact PAM, not "LAN/LAN Cargo," actually paid Hidalgo.  Indeed, Ureta's failure to pin down LAN Cargo (especially since he is its current CEO) corroborates Hidalgo's dual employment argument.  And, contrary to Ureta's position, PAM's CEO Gartlan attests that PAM is an "employee leasing company" that pays "bonuses" for individuals hired by clients, such as LAN or LAN Cargo. [D.E. 158-3].  And that although he has "no other information" relating to the payments, LAN Cargo's Ramirez authorized PAM to pay each invoice and LAN subsequently reimbursed PAM for those payments. *Id.*[32]

Putting aside the lack of rebuttal evidence from the evidentiary hearing, or that the Government secured two affidavits after-the-fact on this issue, ultimately, neither LAN Cargo nor PAM is able to present a viable explanation or unequivocally deny that Hidalgo received *$249,710.91*, authorized by LAN Cargo and paid (through PAM) by LAN, while Hidalgo *purportedly only worked for Florida West*.  This undisputed fact *significantly* cuts against the Government's position.

Finally, Hidalgo points to his receipt benefits and contends that he received benefits commensurate with this status a LAN Cargo executive, which he contends was greater than the benefits he would have otherwise received solely as a Florida West employee.  While the Government disputes the probative value of this evidence,

---

[32] Additionally, generally speaking, LAN Cargo's attorney testified that LAN Cargo paid some if its employees through entities other than LAN Cargo. *See* 8/23 Tr. Dick 114:5-18.

Hidalgo asserts that he received additional complimentary flights, held an insurance card that read "LAN Chile Airlines Executive," and was referred to as an "expatriado" and an "executive" in LAN communications.  The Government again dismisses these contentions as self-serving, but fails to rebut the evidence with any specific testimony or documents.  Moreover, unlike the salary or bonus issues, the Government's subsequent affidavits fail to even comment on this issue.

Again, we recognize that some of Hidalgo's position is supported solely by his testimony and testimony from individuals who worked with him at SFAC or Florida West.  But, we find Hidalgo's and his witnesses's testimony credible.[33]  While Hidalgo is indeed biased and motivated by his desire to establish immunity, the record evidence corroborates his position.   Moreover, Hidalgo's argument is bolstered by the Government's inability to present compelling rebuttal testimony from any LAN Cargo employee or executive (again, *all of which are immunized*) to refute Hidalgo's position.

_____

[33] "Credibility determinations are typically the province of the fact finder because the fact finder personally observes the testimony and is thus in a better position than a reviewing court to assess the credibility of witnesses." *United States v. Ramirez-Chilel,* 289 F.3d 744, 749 (11th Cir. 2002); *see also United States v. Pineiro,* 389 F.3d 1359, 1366 (11th Cir. 2004) (recognizing that credibility determinations are within the province of the factfinder). In making its credibility determination, the Court must take into consideration not only the interests of the witness, but also "the internal consistency of the [witness's] testimony, or his candor or demeanor on the stand." *Ramirez-Chilel,* 289 F.3d at 749, 750 (citations omitted).  Having reviewed the testimony at the hearing, observed the demeanor of the witnesses, and considered the interests of the witnesses, the Court credits each witness, especially Hidalgo's testimony concerning his relationship with LAN Cargo and its relationship with Florida West (notwithstanding his self-interest) because, in part, the Government failed to rebut it.  Moreover, the Court credits the testimony of disinterested witness Haubold concerning LAN Cargo's control of Florida West.

Objectively speaking, this task should not have presented an overly burdensome hurdle for the Government to overcome, if in fact it was not true. Standing unrebutted, this evidence presents the most probative evidence supporting his contention that he was a LAN Cargo employee. Based on the complete record, we conclude that Hidalgo was a LAN Cargo employee.

ii.    *SFAC is a LAN Cargo Subsidiary*

As a preliminary matter, Hidalgo is immune from prosecution for the period of the indictment when he worked for SFAC: January 1, 2002 through July 31, 2002. Hidalgo was an employee of SFAC during the period January 2002 until July 31, 2002. 8/22 Tr. Hidalgo 115:22–116:5, 206:2-3. And SFAC was a wholly owned subsidiary of LAN Cargo. Hidalgo 38:17-19; 8/23 Tr. Dick 162:23-25. Thus, under the terms of paragraph 15, Hidalgo is immunized for his conduct during that period. To be sure, Mark Grundvig, the Government attorney who drafted the Plea Agreement, testified that this result is correct. 8/23 Tr. 48:8-13; 93:23–94:18 ("If South Florida Air Cargo was a subsidiary of LAN Cargo [*it is*], and if he was an employee of South Florida during that time period [*he was*], he would be covered."); Dick 150:7-10; 163:1-19; [D.E. 159 (the Government also fails to dispute this conclusion in its post-evidentiary filings and, thus, effectively concedes this outcome is appropriate from the facts presented during the evidentiary hearing). Accordingly, the indictment against Hidalgo should be dismissed for the period of January 1, 2002 through July 31, 2002.[34]

---

[34] We recognize there is conflicting evidence that suggests SFAC may be a wholly owned subsidiary of LAN or "LAN Chile" rather than LAN Cargo. *See* [D.E. 159 at 13

### iii.   *Florida West is Not a LAN Cargo Subsidiary*

Hidalgo makes a prima facie showing that LAN Cargo exercised actual control over Florida West.  The question then is whether LAN Cargo's actual control combined with its 25% minority ownership interest, is sufficient to establish that Florida West is LAN Cargo's subsidiary.  As noted above, this question turns on the Plea Agreement's undefined term.

After a thorough review of the legal authority relied on by Hidalgo and the Government, we begin the discussion by concluding that the Plea Agreement is unambiguous notwithstanding that the term "subsidiary" is undefined.  An unambiguous plea agreement is interpreted and decided by the court as a matter of law.  *See United States v. Weaver*, 905 F.2d 1466, 1472 (11th Cir. 1990) (citing *United States v. Harvey*, 791 F.2d 1439, 300 (11th Cir. 1989)).  Merely because a term is undefined will not render a contract ambiguous *per se*; rather, courts apply the natural, ordinary and plain meaning to the term.  *See John M. Floyd & Associates, Inc. v. First Credit Union*, No. 11-11662, 2011 WL 4536897, at *2 (11th Cir. Oct. 3, 2011) (citing *Golf Scoring Sys. Unlimited, Inc. v. Remedio*, 877 So. 2d 827, 829 (Fla. 4th DCA 2004) ("Words should be given their natural meaning or the meaning most commonly

---

n.29].  As a preliminary matter, the Government was in the best position to unequivocally resolve this question, but it failed to do so.  While our decision is supported by evidence, we comment on the conflicting evidence only to note that the result would be the same even if factually SFAC was a LAN subsidiary.  The record makes clear that Hidalgo's services were all for the sale of air cargo services for LAN Cargo.  *See* I.B.i,ii, *infra*.  As such, he would still be covered under the plea agreement as an employee of LAN's subsidiary SFAC.

understood ...." )); *ProfiTel Group, LLC v. PolyOne Corp.*, 238 F. App'x 444, 447 (11th Cir. 2007); *United States v. Beeks*, 167 F. App'x 777,  790 (11th Cir. 2006) (applying this principle to a plea agreement); *Simpson Bros., Inc. v. District of Columbia*, 179 F.2d 430, 434 (D.C. Cir. 1949).  Courts often turn to resources such as Black's Law Dictionary to determine the plain, ordinary and natural meaning of a term. *See, e.g., Dunn v. Commodity Futures Trading Comm'n*, 519 U.S. 465, 470 (1997); *Frulla v. CRA Holdings, Inc.*, 543 F.3d 1247, 1253 n.3 (11th Cir. 2008).

Hidalgo and the Government agree that the Plea Agreement is unambiguous, but they advance divergent interpretations for the agreement's unambiguous term. This will not necessarily render the Plea Agreement ambiguous. *See, e.g., Frulla*, 543 F.3d at 1252.  Rather, the question is whether the term or provision in question is susceptible to more than one *reasonable* interpretation because of uncertain meanings of terms, missing terms or other facial deficiencies.  *Id.; Orkin Exterminating Co., Inc. v. F.T.C.*, 849 F.2d 1354, 1360 (11th Cir. 1988); *see also Green v. Biddle*, 21 U.S. 1, 38 (1823) ("where the words of a law, treaty or contract, have a plain and obvious meaning, all construction, in hostility with such meaning, is excluded."); *Ennis v. Warm Mineral Springs, Inc.*, 203 So. 2d 514, 518 (Fla. 2d DCA 1967) ("If a contract is susceptible to two constructions, one of which is fair, customary, and such as a prudent man would naturally execute, while the other would make it inequitable and unnatural, the reasonable, logical and rational interpretation should be adopted.").

If a contract has more than one reasonable interpretation, then the court must necessarily turn to extrinsic evidence to determine the intent of the parties at the time of contacting to resolve the ambiguity. *Frulla*, 543 F.3d at 1252.  If extrinsic evidence proves unhelpful, then the court should construe the plea agreement against the government.  *United States v. Copeland*, 381 F.3d 1101, 1105 (11th Cir. 2004); *United States v. Clark*, 218 F.3d 1092, 1095 (9th Cir. 2000); *United States v. Harvey*, 791 F.2d 294, 300 (4th Cir. 1986).  However, a court should not blindly construe a document against the government when extrinsic evidence elucidates that the parties' intent comports with the intent advanced by the government. *See Southern Dredging Co., Inc. v. United States*, 35 F.3d 557, at *5 (4th Cir. 1994) (applying this principle in the plea agreement context); *Harvey*, 791 F.2d at 303.  With these principles in mind, we turn to the Parties' respective arguments.

The Government argues the term "subsidiary" naturally and ordinarily denotes a corporation that another company has a majority ownership stake in.   The Government relies on various sources for this proposition. *See Black's Law Dictionary* 394 (9th ed. 2009)  ("a corporation in which a parent corporation has a controlling share"); *accord* 18 Am. Jur. 2d Corporations § 41 ("a subsidiary corporation is one in which another corporation, a parent corporation, owns a majority of the shares of its stock."); *see also Cont'l Distilling Sales Co. v. Vocelle*, 27 So. 2d 728 (Fla. 1946) (evidence of control of the stock and affairs of another corporation by a parent corporation establishes status as a corporate subsidiary); *Liggett Group, Inc. v. Ace*

*Prop. and Cas. Ins. Co.*, 798 A.2d 1024, 1035 (Del. 2002) ("ordinary and plain meaning"

of subsidiary requires ownership of more than half the stock by parent); *Delaware Ins.*

*Guar. Ass'n v. Christiana Care Health Svcs., Inc.*, 892 A.2d 1073, 1077 (Del. 2006) ("the

terms 'affiliate' and 'subsidiary' carry their own legal significance, ... Affiliate refers to

a 'corporation that is related to another corporation by shareholding or other means of

control,' and subsidiary refers to a 'corporation in which a parent corporation has a

controlling share'") (citing *Black's Law Dictionary*)).[35]   As such, the Government

endorses a "majority ownership" definition for subsidiary and argues that because LAN

Cargo owned a *minority* interest in Florida West, it is not a subsidiary of LAN Cargo

as a matter of law.

On the other hand, Hidalgo advances a broader interpretation and relies on a

statutory definition from Delaware's Code on corporate law. *See* 8 Del. C. § 220(a)(2)

("'Subsidiary' means any entity directly or indirectly owned, in whole or in part, by the

corporation of which the stockholder is a stockholder and over the affairs of which the

corporation directly or indirectly exercises control."); *see also Weinstein Enterprises, Inc.*

---

[35] During the June 2, 2011 non-evidentiary hearing, the Government noted that Florida West is a Delaware company and suggested applying Delaware law because of the breadth of corporate law there. [D.E. 105 at 35:6-10].  Subsequently, the Parties briefed (in part on their own; in part by court order) the subsidiary issue relying on Delaware law. [D.E. 102; 103; 106; 117].  Neither party objected to the Court's direction to apply Delaware law.  Later, the Court set the evidentiary hearing and couched the subsidiary issue in terms of Delaware law. [D.E. 124].  The Parties again raised no objection to the application of Delaware law to this issue.  Because Florida West is a Delaware company and is a state known for its corporate law jurisprudence, we also look to Delaware law for guidance on this issue. *See, e.g., IBS Financial Corp. v. Seidman & Associates, L.L.C.*, 136 F.3d 940 (3d Cir. 1998) (noting that courts often look to Delaware's rich abundance of corporate law for guidance).

*v. Orloff*, 870 A.2d 499 (Del. 2005) (citing 8 Del. C. § 220(a)(2)).  Thus, unlike the Government's "majority ownership" definition, this interpretation shifts the focus from ownership to a factual question of actual control.  Indeed, Hidalgo contends that under Delaware law, the "dispositive inquiry" in determining whether a company is a subsidiary is not majority ownership but rather "whether the stockholder 'controls the affairs' of the corporation." *Weinstein*, 870 A.2d at 507.  Continuing, Hidalgo asserts that the Delaware Supreme Court explained, for a shareholder such as LAN Cargo who "owns less than a numerical majority of a corporation's voting shares" to be deemed to have a controlling interest, "the plaintiff must establish the *actual exercise* of control over the corporation's conduct by that otherwise minority stockholder." *Id.* at 507 (emphasis in original).  In fact, much of Hidalgo's authorities focus on the issue of control and otherwise assume the court will adopt the statutory definition used in *Weinstein. See, e.g., Amadeus Global Travel Distribution v. Orbitz, LLC*, 302 F. Supp. 329 (D. Del. 2004) (concluding that an affiliate with less than a majority ownership did not exercise actual control over the corporation); *In re Western Nat'l Corp. Shareholders Litig.*, No. 15927, 2000 WL 710192, at *9 (Del. Ch. May 20, 2000) (court concluded that a minority shareholder with 46% owner did not actually control company); *Kahn v. Lynch Commc'n. Sys, Inc.*, 638 A.2d 1110 (Del. 1994) (concluding that notwithstanding its 43.3% minority shareholder interest, facts failed to demonstrate exercise of actual control over corporation).  Simply put, Hidalgo asserts that any degree of ownership with a showing of actual control establishes a parent-subsidiary relationship.

Based on the Plea Agreement's use of the term "subsidiary," the plain and ordinary meaning of that term, and the principles set forth above, we conclude that the Government offers the only reasonable interpretation: a "subsidiary" is a corporation in which a parent corporation owns a controlling share. Hidalgo's alternative interpretation, after due consideration, is simply not reasonable.

Rather, his broader interpretation conflicts with the plain and ordinary meaning of the term because it advances a specialized definition limited to a Delaware corporate statute. Without an otherwise compelling basis to do so, Hidalgo's specialized definition is inapplicable to the Plea Agreement. *See, e.g., Irrizary-Sanabria v. United States*, Nos. 8:02-CR-490-T-17TBM, 8:05-CV-436-T-17TBM, 2006 WL 1319417, at *6 (M.D. Fla. May 12, 2006) (citing *United States v. Rubbo*, 396 F.3d 1330, 1333-35 (11th Cir. 2005) ("plea agreements must be interpreted 'in accord with what the parties intended" and, in the absence of record evidence to the contrary, "statutory maximum" must be given its "ordinary and natural meaning" and not the "specialized" meaning discussed in *Blakely* and *Booker*)); *United States v. Jacobs*, 635 F.3d 778, 782 (5th Cir. 2011) (court interpreted a plea agreement and declined to utilized an alternative meaning for "departure" in sentencing context because the parties establish no intent to carry an atypical or specialized definition); *Hooters of Augusta, Inc. v. American Global Ins. Co.*, 157 F. App'x 201, 206 (11th Cir. 2005) (Eleventh Circuit rejected an attempt to apply the specialized meaning for the term "privacy" defined in the Telephone Consumer Protection Act, 47 U.S.C. § 227, to trump the parties' contractual

intent when the contract itself left the term "privacy" undefined.  The court applied the plain, ordinary and natural meaning instead); *see also Krupnick v. Ray,* 61 F.3d 662, 665 (8th Cir. 1995) (court refrained from applying a specialized meaning to an undefined term absent some indiction that the parties intended a specialized meaning).[36]

Moreover, *Weinstein,* Hidalgo's chief authority, demonstrates that Hidalgo's interpretation is inapplicable.  Indeed, *Weinstein* explicitly limited its holding, as did the court of chancery below, to the determination of a subsidiary "for purposes of being a section 220(a)(3) 'subsidiary'" only.  870 A.2d at 501, 502, 507, 508, 509.  A review of the statute, in context with its purpose, explains the basis for this restriction.  Section 220(a) provides a mechanism for a plaintiff to seek the books and records of a corporation in which he or she owns stock. *Id.* at 505.  Based on *Weinstein*, the purpose, at least in part, was to provide an economical and expedition mechanism for the inspection of documents. *Id.*  This point is emphasized by the 2003 amendment to section 220 that removed the requisite showing of fraud or alter ego before a stockholder could review a subsidiary's documents. *Id.*  Thus, as a general matter, a purpose of section 220 is to provide stockholders greater access to information, which supports the notion that the definition for subsidiary is worded broadly. *Id.* Again, this

---

[36] *Jacobs* further notes that without extrinsic evidence establishing an alternative, uncommon meaning, the court will not narrowly construe a plea agreement against the government. *Id.*

conclusion is buttressed by *Weinstein's* repeated restriction of its holding to the context of that statute. *See id*.

Furthermore, we find that a closer reading of Hidalgo's authorities demonstrates that a minority ownership interest is insufficient to establish a parent-subsidiary relationship. For instance, *Weinstein* reached its conclusion after noting that the plaintiff actually held *greater* than a minority interest, "[the court of chancery's subsidiary] ruling was based upon the 45.16% [direct ownership], *plus the six or seven percent of stock that the Weinstein Foundation owned*." 870 A.2d at 7 (emphasis added). Thus, plaintiff Weinstein actually held an aggregate direct and indirect ownership interest in Mays that totaled between 51.16% and 52.16%. *Id*. While *Weinstein* did not rely specifically on the indirect ownership percentage, it still suggests that the total share of voting control exceeded a majority percentage. Here, however, Hidalgo fails to proffer any evidence that LAN Cargo owns, directly or indirectly, any share greater than 25% of Florida West.

Because the additional authorities Hidalgo cites either present similarly inapplicable specialized definitions (or cases relying on same) that conflict with the plain, ordinary meaning of the term "subsidiary," *see* 12 U.S.C. § 1841 (a)(2)(A); *United States v. Citizens & Southern Nat'l Bank*, 422 U.S. 86 (1975); *Rose Hall, Ltd. v. Chase Manhattan Overseas Banking Corp.*, 576 F. Supp. 107 (D.C. Del. 1983), or discuss the secondary and dependant issue of "actual control" in the minority ownership context, *see Amadeus Global Travel Distribution v. Orbitz, LLC*, 302 F. Supp. 329 (D. Del.

2004); *In re Western Nat'l Corp. Shareholders Litig.*, 2000 WL 710192, at *9 (Del. Ch. 2000); *Kahn v. Lynch Cmmctn. Sys, Inc.*, 638 A.2d 1110 (Del. 1994); 8 Del. C. § 203(c)(4), we conclude that Hidalgo fails to cite any controlling authority that establishes his broader subsidiary definition as reasonable.

Moreover, Hidalgo's interpretation would produce an illogical result, which courts are keen to avoid. *See Ennis*, 203 So. 2d at 518 (a rational and logical interpretation is favored over an illogical or irrational one). Hidalgo's interpretation, taken to its logical extreme, would result in a parent-subsidiary relationship when a "parent" corporation owns merely one percent of the stock and exercises actual control over the "subsidiary" corporation. However, this conclusion tends to muddle the distinct corporate labels ascribed to "subsidiaries" and "affiliates," the latter of which is understood more broadly to include some degree of ownership or control while the former is distinguished by requiring a controlling, majority ownership. *See generally Delaware Ins. Guar. Ass'n v. Christiana Care Health Svcs., Inc.*, 892 A.2d 1073, 1077 (Del. 2006) ("the terms 'affiliate' and 'subsidiary' carry their own legal significance").

Notwithstanding the foregoing, even if we agree that Hidalgo's interpretation presents a reasonable interpretation for "subsidiary" (thus rendering the Plea Agreement ambiguous), we still reach the same result because extrinsic evidence demonstrates that the intent of the drafters supports the Government's interpretation of subsidiary. *See* 8/23 Tr. Grunvig 22:25–23:7, 23:23–24:2, 25: 9-17; Dick 111:3 – 112:5 (no intent for "subsidiary" to include Florida West); *see also Copeland*, 381 F.3d at 1106

48

(where the language of a plea agreement is ambiguous, extrinsic evidence of the parties' intent may be considered to interpret the agreement); *Southern Dredging*, 35 F.3d at *5 (plea agreement is not construed against the government when extrinsic evidence clearly supports the government's interpretation).

While the interpretation of a plea agreement is analogized to the interpretation of a private contract, this analogy is tempered by the unique nature of a plea agreement. As *Jefferies* makes clear, a court should avoid a "hyper-technical reading of the written agreement" and view the written document "against the background of the negotiations." 908 F.2d at 1523. Because Hidalgo advances a hyper-technical interpretation of the Plea Agreement that fails to recognize the background of the plea negotiations, we decline to accept his position. The Government's interpretation comports with the plain, natural and ordinary meaning of the unambiguous term subsidiary. The bottom line is that the plain wording of the plea agreement controls. *See Santobello v. New York*, 404 U.S. 257 (1971); *United States v. Gustama*, 156 F. App'x 214, 217 (11th Cir. 2005); *In re Arnett*, 804 F.2d 1200, 1203 (11th Cir. 1986); *United States v. Jackson,* 173 F. App'x 772, 775 (11th Cir. 2006); *United States v. Rewis*, 969 F.2d 985, 988 (11th Cir. 1992). The plain meaning of "subsidiary" necessarily requires the parent corporation to own a majority share of the subsidiary corporation. As such, Florida West is not a subsidiary of LAN Cargo.

### D.   *Florida West's Motion to Dismiss Should be Denied*

As clarified in its closing argument [D.E. 160], Florida West seeks to dismiss the indictment for two reasons. First, that Florida West is a subsidiary of LAN Cargo and, therefore, immunized by paragraph 14 of the Plea Agreement. Alternatively, because Hidalgo is a "LAN" employee covered by the Plea Agreement his actions cannot be imputed to Florida West.

### i.   *Florida West is Not Immunized by the Plea Agreement*

As explained above, notwithstanding LAN Cargo's minority ownership interest, Florida West is not a LAN Cargo subsidiary. Therefore, Florida West is not immunized under paragraph 14 of the Plea Agreement. And, even if it was a "subsidiary" of LAN Cargo, paragraph 14 specifically carves out any "company in which LAN Cargo had an ownership interest that ended prior to the date of the Plea Agreement," i.e. January 2009. Because LAN Cargo sold its ownership interest in Florida West on or about December 20, 2007, Florida West is carved out of the Plea Agreement. *See* D.E. 76 at 9 n.6. Florida West's remaining Plea Agreement arguments are either resolved above, *see* II.C.iii., *supra*, or are without merit and should be denied accordingly.

### ii.   *Florida West's Imputation Argument is a Jury Issue*

Florida West also agues that its liability, to the extent such liability exists, arises solely from the actions of Hidalgo. But, because Hidalgo's culpable actions related to his employment relationship with LAN Cargo and thus were taken outside the scope of his Florida West employment, they cannot be imputed to Florida West. *Contra Grand Union Co. v. United States*, 696 F.2d 888, 891 (11th Cir. 1983) (holding,

in the False Claims Act context, that the knowledge of an employee is imputed to the corporation when the employee acts for the benefit of the corporation and within the scope of his employment). While we agree that Florida West may have a compelling *defense* to criminal liability based on this argument, this is not an appropriate ground to *dismiss* the pending indictment. *See, e.g., United States v. Singh*, 518 F.3d 236, 249-251 (4th Cir. 2008) (corporation presented the aforementioned argument as a defense during trial, rather than to the court for dismissal pre-trial); *United States v. Basic Const. Co.,* 711 F.2d 570 (4th Cir. 1983) (same); *cf. United States v. Cargo Service Stations, Inc.*, 657 F.2d 676, 684-85 (5th Cir. Unit B 1981) (court upheld conviction of corporations for antitrust violations even though every person who could have acted as their agent was acquitted of criminal wrongdoing). Tellingly, Florida West fails to cite any case that stands for this proposition on a motion to dismiss in the criminal context.

And, strictly from a practical standpoint, the indictment references other named defendants and "co-conspirators" and, thus, on the face of the indictment, we cannot foreclose as a matter of law that the indictment *solely* imposes liability on Florida West through the acts of its agent Hidalgo. *See* [D.E. 1 at ¶¶8-12]; Fed. R. Crim. P. 12(b)(2), (3)(B); *United States v. Delbecq*, No. 11-60146-CR-ZLOCH, 2011 WL 4383255, *1 (S.D. Fla. Aug. 17, 2011) (relying on several Eleventh Circuit cases for the proposition that a factual challenge, like the one presented here, is inappropriate in a Rule 12 motion),

*aff'd,* 2011 WL 4375050 (S.D. Fla. Sept. 20, 2011).   Florida West plainly raises a

factual issue for a jury, rather than this Court, to resolve.

> ### E.        *Reformation of the Plea Agreement*

The Government alternatively moves to reform the Plea Agreement because, as

it contends, if either Hidalgo or Florida West are immunized by the Plea Agreement

the result is solely due to a mutual mistake of fact by the drafters.   As such, the

Government seeks the contractual remedy of reformation to correct this purported

mutual mistake.

Jurisprudence in this area is fairly sparse.   And, the opinions that do raise the

issue of reformation of plea agreements are factually distinguishable because they

relate to sentencing. *See, e.g., United States v. Weaver*, 905 F.2d 1466 (11th Cir. 1990);

*United States v. Hodge*, 306 F. App'x 910 (6th Cir. 2009); *United States v. Olesen*, 920

F.2d 538 (8th Cir. 1990); *United States v. Kuhl*, 816 F. Supp. 623 (S.D. Cal. 1993);

*United States v. Atkinson*, 979 F.2d 1219 (7th Cir. 1992); *United States v. Williams*, 198

F.3d 988 (7th Cir. 1999).   Also, none of these cases cited by the Government actually

reform a plea agreement by applying this civil equitable remedy.   *See, e.g., Weaver*, 905

F.2d at 1473; *Hodge*, 306 F. App'x at 915; *Olesen*, 920 F.2d at 542, *Kuhl*, 816 F. Supp.

at 628-29; *Atkinson*, 979 F.2d at 1223; *Williams*, 198 F.3d at 994.   Moreover, there is

a significant weight of authority that suggests this remedy is inapplicable to plea

agreements. *See United States v. Ritsema*, 89 F.3d 392, 398-99 (7th Cir. 1996); *United*

*States v. Skidmore*, 998 F.2d 372, 374-76 (6th Cir.1993); *United States v. Fagan,* 996

F.2d 1009, 1013 (9th Cir.1993); *United States v. Yesil,* 991 F.2d 1527, 1531-32 (11th Cir.1992); *United States v. Cunavelis,* 969 F.2d 1419, 1422-23 (2d Cir.1992); *United States v. Fernandez,* 960 F.2d 771, 773 (9th Cir.1992) (per curiam); *Olesen,* 920 F.2d at 540-43; *United States v. Partida-Parra,* 859 F.2d 629, 631-33 (9th Cir.1988); *United States v. Holman,* 728 F.2d 809, 813 (6th Cir. 1984), *cert. denied,* 469 U.S. 983 (1984); *United States v. Cruz,* 709 F.2d 111, 114-15 (1st Cir.1983); *United States v. Blackwell,* 694 F.2d 1325, 1338-39 n.19 (D.C. Cir.1982).  Thus, without presenting a compelling reason to rule otherwise, we conclude that the remedy of reformation is unavailable in the context of a plea agreement entered into by the Parties and approved by the court.

Assuming, however, that reformation is an available remedy, we find that its application is inappropriate for this situation.  The undisputed intent of the drafters was to immunize employees of LAN Cargo and its subsidiaries. "[R]eformation of a written agreement is warranted only when the evidence demonstrates that the parties' mutual mistake resulted in a written document which does not accurately reflect the terms of their agreement." *Weaver*, 905 F.2d at 1472.  But, in fact, this is precisely the effect of the Plea Agreement.

The purported mistake arises from the intended scope of the Plea Agreement. While the Government contends the mistake is "mutual," a more accurate description is that the Government was mistaken by the scope of the agreement while LAN Cargo was only concerned with ensuring that the employees of LAN Cargo and LAN Cargo's subsidiaries were immunized, without any explicit concern for either Hidalgo or

Florida West. *See* 8/23 Tr. Dick 111-112, 115:25–116:6.  Simply because the facts subsequently establish that Hidalgo is an employee of LAN Cargo does not establish a basis for reformation because the intent of the parties is fulfilled.

Rather than reformation, arguably the more appropriate remedy in this situation is rescission because the mutual mistake relates to a basic assumption of the Plea Agreement, i.e. who were LAN Cargo's employees. *See* Restatement (Second) of Contracts, § 152(1) ("Where a mistake of both parties at the time a contract was made as to a basic assumption on which the contract was made has a material effect on the agreed exchange of performances, the contract is voidable by the adversely affected party unless he bears the risk of the mistake under the rule stated in § 154); *see id.* at cmt. b, illus. 5 ("A contracts to sell and B to buy a tract of land, on the basis of the report of a surveyor whom A has employed to determine the acreage.  The price is, however, a lump sum not calculated from the acreage.  Because of an error in computation by the surveyor, the tract contains ten per cent more acreage than he reports.  The contract is voidable by A."); *see also United States v. Rodriguez-Galicia*, No. 2:10-cr-32-MEF, 2010 WL 3724905, at 5 n.4 (M.D. Ala. Sept. 17, 2010)(discussing this section of the Restatement with respect to plea agreements).

We find this illustration helpful.  Similarly, the attorney for LAN Cargo and the Government relied on information supplied by LAN Cargo to define the scope of the intended language that immunized the employees of LAN Cargo and LAN Cargo's subsidiaries.  Because the information received inaccurately defined that scope the intent of the Plea Agreement mistakenly afforded immunity to a larger group.  Thus,

because the intent is fulfilled, but expanded by a flawed basic assumption, the only available remedy is rescission.  However, because the Government does not seek this remedy, we decline to apply it *sua sponte*.[37]

### F.    *Government's Motion to Re-Open the Evidentiary Hearing*

At the end of the evidentiary hearing, *after* the Parties rested, *after* two full days of evidence, *after* more than two months notice, and *only after* the Court intimated how it may rule on the Motions, the Government expressed a strong interest to re-open the evidentiary hearing.  The Government explained to the Court that it was ill-prepared for the surprise allegations that LAN Cargo controlled Florida West pursuant to a purported "secret agreement" or that LAN Cargo confidentially employed Hidalgo.  As such, the Government requested an opportunity to re-open the evidentiary hearing to rebut the control issue and to "shed light" on the "purported 'bonus' payments defendant Hidalgo received." [D.E. 158 at 1-2].  Hidalgo countered that the record belied any argument that the Government was unaware of the relevant issues in this matter.  Moreover, he asserted that the Government had ample time to prepare for the hearing and secure any necessary witnesses to support its position.  And, as such, the Government's argument was nothing more than a thinly veiled attempt to have a do-over.  We agree with Hidalgo.

---

[37] The Government's decision not to seek rescission as a remedy is not surprising. The Government obtained a criminal penalty of $109 Million from LAN Cargo (and ABSA) in exchange for the Plea Agreement.

"The decision to reopen a case to introduce evidence after the parties have rested is committed to the sound discretion of the district court." *United States v. Cohen*, 888 F.2d 770, 775 (11th Cir. 1989).  The Eleventh Circuit delineates certain factors to guide this inquiry, including 1) the timeliness of the motion to reopen, 2) the character of the testimony to be offered, 3) the effect of granting the motion to reopen, and 4) the reasonableness of the excuse for the request to reopen. *See United States v. Byrd,* 403 F.3d 1278, 1284 (11th Cir. 2005) (adopting factors developed in *United States v. Walker*, 772 F.2d 1172, 1176 (5th Cir. 1985) that are relevant to "evaluate all challenges to a district court's refusal to reopen the evidence.").

*Timeliness.*  The Parties presented evidence relating to Hidalgo's LAN Cargo employment and LAN Cargo's "control" over Florida West during the first day of the hearing.  The second day was limited to evidence relating to the issue of intent.  Thus, in all practical respects, the Parties rested on the former issues on the first day.  The Government rested completely in the afternoon on the second day.  Then, during closing remarks, the Court, while it adumbrated its ruling to the Parties, speculated as to the existence of other evidence that could support the Government's position. *Only at this point* did the Government move to reopen the evidentiary hearing.  Thus, the timing suggests that the Government's motivation to reopen the hearing was more likely related to the Court's comment, rather than a surprise from the previous day.  Had the Government been truly surprised on the previous day, the Government ought to have raised its concern *at that time*.  By so doing, the Court would have credited its

motion as "timely."  However, because the Government waited for the Court to raise the issue, we find this factor weighs in Hidalgo's favor.

*Character of testimony*.  The Government submits affidavits from three LAN Cargo executives (Ureta, Germani and Ramirez) and the CEO and owner of PAM (Gartlan) that purport to "assert unequivocally" that LAN Cargo did not control Florida West, that rebut the evidence Hidalgo presented to support his subsidiary argument, and rebut that LAN Cargo employed Hidalgo.  Because we rule as a matter of law that Florida West is not a LAN Cargo subsidiary, we discuss the bonus/employment issue only.

The affidavits submitted by Ureta, Germani and Gartlan discuss the topic of Hidalgo's employment and his purported bonus payments.  However, the admissibility and probative value of Ureta's and Germani's affidavit is tempered by the qualifying language used.  Indeed, Much of their affidavits are couched in terms that exhibit personal belief rather than personal knowledge such as, "[never] did I personally ever have knowledge of", "I was not aware of", "[based on] *my view* of the facts and circumstances as *I understood them to be*", "I was unaware of any occasion in which it could accurately be said that",  "it is my view that", "I did not consider", "I am unaware of", "my understanding of the relationship [was]."[38] *See* [D.E. 158-1, 158-2].

_____

[38] The affidavits from LAN Cargo's executives raise an additional red flag, which compliments their qualifying nature.  A finding that LAN Cargo controlled Florida West implicates the Federal Aviation Act and now potentially subjects LAN, LAN Cargo or Florida West to severe penalties.  Thus, the timing of their affidavits indeed raises questions as to their motivation.  Moreover, this concern is amplified because, while they purport to discredit the control evidence, they are largely based on personal

Put differently, these affidavits rely on speculation and personal belief rather than personal knowledge that set forth facts that would be admissible evidence. Courts often strike or discredit this type of affidavit. *See, e.g., Pace v. Capobianco,* 283 F.3d 1275, 1278-79 (11th Cir. 2002) ("an affidavit stating only that the affiant 'believes' a certain fact exists is insufficient to defeat summary judgment by creating a genuine issue of fact about the existence of that certain fact"); *Mize v. Jefferson City Bd. of Educ.,* 93 F.3d 739, 742 (11th Cir. 1996) ("For factual issues to be considered genuine, they must have a real basis in the record."); *Stagman v. Ryan,* 176 F.3d 986, 995 (7th Cir. 1999) (explaining that statements that are conclusory or based on conjecture do not satisfy Rule 56(e)); *Rolison v. Sterling,* No. 08-0389-CG-M, 2009 WL 2514294, *6 (S.D. Ala. Aug. 13, 2009).[39]   In fact, only Gartlan's affidavit complies with these principles, but he largely supports Hidalgo's position. *See* pp. 15, 38-39, *supra.*   As such, we conclude that the second factor also weighs in Hidalgo's favor.

*Effect of granting the motion.*   This factor relates to the prejudice imposed on the nonmovant by reopening the evidentiary hearing. *See Byrd*, 403 F.3d at 1287.   The Government asserts that the prejudice is negligible because Hidalgo will have an opportunity to cross any new witness or present his own evidence in rebuttal.   While this may be true, the prejudice arises from the benefit the Government receives by

---

belief and speculation which would ameliorate any risk to them of perjury.

[39] Like ancillary forfeiture proceedings which arise out of criminal cases but are civil in nature, this issue is civil in nature (breach of contract) and, thus, ought to be governed by the Federal Rules of Evidence applicable to summary judgment, including Rule 56(c). *See* Fed. R. Crim. P. 32.2(c)(1)(B).

hearing Hidalgo's evidence and crafting its rebuttals accordingly.  Indeed, even though the four affiants were not physically present in the courtroom, their affidavits tend to suggest they were privy to the subject matter of the hearing because they track the testimony proffered by the various witnesses.  *See* [D.E. 159-1,2,3,4].

The prejudice caused by this advantage is echoed by several courts. *See, e.g., Byrd*, 403 F.3d at 1287 (the "[defendant] would have been in a position to work his testimony around theirs, changing his story in order to avoid discrepancies between the rebuttal witnesses' testimony and the defense's case.  Likewise, the [defendant] would also have been aware of what the rebuttal witnesses did not know, allowing him to 'decide as a strategic matter that it would be safe to ... testify to certain matters.'")(citing *United States v. Walker*, 772 F.2d 1172, 1180 (5th Cir. 1985)). Moreover, due to the unavoidable fact that the Government submitted affidavits *after* hearing Hidalgo's entire direct, the fact that the affidavits so precisely track the evidence proffered by Hidalgo raises a potential rule of sequestration violation.[40] *See United States v. Smith*, 318 F. App'x 780, 795 (11th Cir. 2009)(no error by district court excluding witness because of violation of rule of sequestration); *United States v. Gibbs*, 237 F. App'x 550, 556 n.5 (11th Cir. 2007) (noting that because second witness read transcript from earlier proceeding at which rule of sequestration was invoked, the judge relied only on the testimony of the first witness); *Mills v. Singletary*, 63 F.3d 999, 1022-23 (11th Cir. 1995) (finding that trial judge did not err in preventing party from

---

[40] Hidalgo's attorney invoked the Rule. *See* 8/22 Tr. 3:20-24.

speaking with additional witnesses after rule had been invoked because party had ample opportunity before the proceeding to conduct any necessary witness interviews). As such, we find this factor also favors Hidalgo.

*Reasonableness*.   The Government fails to offer an objectively reasonable explanation to re-open the evidentiary hearing.  Its explanation that the Defendants presented a novel theory during the evidentiary hearing is simply unsupported by the record.  Without question, one of the reasons we held this evidentiary hearing was to determine whether LAN *controlled* Florida West. *See* [D.E. 124, Order setting evidentiary hearing].  Even before this, Hidalgo argued that he was covered by the "subsidiary" provision of the Plea Agreement in spite of the foreign ownership regulation, thus, implying that LAN "controlled" Florida West notwithstanding that this control violated federal law. *See* [D.E. 67 at 12].

Regardless, the "secret" was unequivocally revealed to the Government during the June 2, 2011 non-evidentiary hearing when Hidalgo's attorney stated in open court, "[LAN] complied *technically* with the rule 25 percent, but I guess *found this way around it*.  I may be creating more problems for Florida West than LAN, but my interests are, of course, to my client." [D.E. 105 at 50:18-25].  Indeed, Florida West's counsel recognized this fact and explained as much during the evidentiary hearing, "I will admit that it's a very unique set of circumstances. It was not until *two months ago* [i.e. the June 2, 2011 non-evidentiary hearing] that we learned that Hidalgo – there's no question, we moved for severance. ... We had no idea Hidalgo was being paid like

a *secret agent to work for LAN.*" *See* 8/23 Tr. 226:11-17. (emphasis added). Thus, best case scenario, the Government should have been fully aware of the control issue in June 2011.

Likewise, Hidalgo raised the employment and bonus issue in his initial motion. [D.E. 67 at 2, 10]. And, during the June 2nd hearing, his counsel stated, "[Hidalgo] was assigned by LAN to Florida West, but was continued to be paid by LAN. He got bonuses sometimes of up to $75,000 a year paid by LAN while he was at Florida West." [D.E. 105 at 6:10-13]. Indeed, Florida West filed its May 18, 2011 motion to dismiss *specifically* for that reason. *See* [D.E. 97 at 3]. Thus, the record demonstrates that the Government knew (or should have known) of the Defendants' arguments well in advance of the evidentiary hearing.

But, even assuming this argument had merit, the Government's argument still fails. Accepting that the Government learned of the true nature of the Defendants' arguments during the first day of the hearing, as noted above, the Government failed to alert the Court of this issue. Also, on the second day, the record shows that Ramirez (and perhaps Gartlan) were available in court and could have testified on these specific issues. However, the Government chose not to call them. And, the specific reason for not calling Ramirez was: "[w]e didn't know what – we had no discussions with him previously. We had no idea. We had been told by counsel that *he could be irrational at times.* He was not someone we were willing to put on the stand." 8/23 Tr. 215:14-20. This explanation can hardly be considered reasonable, especially when he most assuredly had personal knowledge of the issues in question – in point of fact, he was

mentioned by name (at a minimum) forty-two times during the evidentiary hearing.

*See* [D.E. 183, 184].

Simply put, the Government had the ability to recover from the purported surprise when it was revealed, but chose not to do so. We find this fact dispositive:

> The requirement that a [party] offer a valid explanation for seeking to testify after the close of evidence is an important one. As the First Circuit noted, '[w]ithout such a requirement of excuse, the rule generally limiting testimony to the evidence-taking-stage of the trial would hardly be a rule at all, and it would be too easy for a [party] to postpone testifying for strategic reasons.'

*Byrd*, 403 F.3d at 1287-88 (quoting *United States v. Peterson*, 233 F.3d 101, 107 (1st Cir. 2000)). Because we find the Government's explanation unreasonable, the fourth factor also weighs in Hidalgo's favor.

In sum, due to the prejudice Hidalgo would likely suffer, the undeniable fact that the Court *not the Government* raised the issue to re-open the hearing, the qualifying nature of the Government's affidavits and the unreasonable explanation offered, the Government's motion to re-open the evidentiary hearing is denied.

### III.   CONCLUSION

Based on the papers filed, evidence presented to this Court, and entire record in this matter, we find that Rodrigo Hidalgo is covered under the Plea Agreement as an employee of LAN Cargo and SFAC. However, because Florida West is not a subsidiary of LAN Cargo, Florida West is not covered by the Plea Agreement. Accordingly, we **RECOMMEND** that:

1.     Hidalgo's Motion to Dismiss [D.E. 67] should be **GRANTED** and all counts of the Indictment as against Hidalgo be Dismissed; and

2.     Florida West International Airways, Inc.'s Motion to Dismiss [D.E. 94] should be **DENIED**.

In light of our Recommendation, it is also **ORDERED AND ADJUDGED** that:

1.     The Government's Motion to Reopen Evidentiary Hearing [D.E. 158] is **DENIED**; and,

2.     Hidalgo's Motion to Compel Documents [D.E. 109], the Government's Motion for Pre-Hearing Rulings [D.E. 139], the Government's Motion to Modify Subpoena Issued to Mark Grundvig in His Official Capacity [D.E. 143], the Government's Motion to Quash Subpoena Issued to Scott D. Hammond in His Official Capacity [D.E. 144], Hidalgo's Motion to Strike Government's Reply to Closing Arguments [D.E. 170] and the Government's Motion to Strike Hidalgo's Response to the Government's Motion to Reopen Evidentiary Hearing [D.E. 175] are **DENIED AS MOOT**.

Pursuant to Local Magistrate Rule 4(b), the parties have **fourteen (14) days** to serve and file written objections, if any, with the Honorable Robert N. Scola, Jr., United States District Judge.  Failure to timely file objections shall bar the parties from a *de novo* determination by the District Judge of an issue covered in the report and bar the parties from attacking on appeal the factual findings contained herein, if any.  *R.T.C. v. Hallmark Builders, Inc.*, 996 F.2d 1144, 1149 (11th Cir. 1993); *LoConte*

*v. Dugger*, 847 F.2d 745 (11th Cir. 1988); *Nettles v. Wainwright*, 677 F.2d 404, 410 (5th Cir. Unit B 1982) (en banc); 28 U.S.C. § 636(b)(1).

    **DONE AND SUBMITTED** in Chambers at Miami, Florida this 9th day of December, 2011.

_____
EDWIN G. TORRES
United States Magistrate Judge